**AMCA INTERNATIONAL CORPORATION, Plaintiff,**

v.

**Kenneth E. KROUSE, Commissioner of Securities and The Warner & Swasey Company, Defendants.**

**No. C–2–79–986.**

United States District Court, S. D. Ohio, E. D.

Dec. 21, 1979.

Patrick J. Smith, Trial Atty., Alexander, Ebinger, Holschuh, Fisher & McAlister, Columbus, Ohio, for plaintiff; Robert P. McAlister and Thomas P. Michael, Columbus, Ohio, of counsel.

John C. Elam, Trial Atty., Vorys, Sater, Seymour & Pease, Columbus, Ohio, for defendants Warner & Swasey; David S. Cupps, Columbus, Ohio, Ellis McKay, Robert A. Profusek, William H. Steinbrink, Jones, Day, Reavis & Pogue, Cleveland, Ohio; John J. Chester, Chester, Saxbe, Hoffman & Willcox, Columbus, Ohio, of counsel.

William J. Brown, Atty. Gen., for Krouse, defendant; Roger P. Sugarman, Asst. Atty. Gen., Trial Atty., James B. Farmer, Bradley A. Hasten, Asst. Attys. Gen., Columbus, Ohio, of counsel.

## OPINION AND ORDER

KINNEARY, District Judge.

This action was brought under 28 U.S.C. Section 1331(a) and 28 U.S.C. Section 2201 for a declaratory judgment and injunctive relief. Plaintiff, AMCA International Corporation [AMCA], challenges the constitutionality of the Ohio statute that governs tender offers,[1] contending that the Ohio Act

---

1. The Ohio Act provides, in pertinent part:

(A) As used in this section:

(1) "Take-over bid" means the acquisition of or offer to acquire, pursuant to a tender offer or request or invitation for tenders, any equity security of a corporation organized under the laws of this state or having its principal place of business and substantial assets within this state, if after acquisition thereof the offeror would, directly or indirectly, be a record or beneficial owner of more than ten percent of any class of the issued and outstanding equity securities of such corporation. "Take-over bid" does not include:

. . . . .

(d) Any tender offer or request or invitation for tenders to which the target company consents, by action of its board of directors, if such board of directors has recommended acceptance thereof to shareholders and the terms thereof, including any inducements to officers or directors which are not made available to all shareholders, have been furnished to shareholders.

. . . . .

(B)(1) No offeror shall make a take-over bid unless at least twenty days prior thereto he announced publicly the terms of the proposed take-over bid and files with the division of securities and the target company copies of all information required by division (B)(3) of this section, and either:

(a) Within ten days following such filing no hearing is ordered by the division or requested by the target company;

(b) A hearing is requested by the target company within such time but the division finds that no cause for hearing exists;

(c) A hearing is ordered within such time and upon such hearing the division adjudicates that the offeror proposes to make fair, full, and effective disclosure to offerees of all information material to a decision to accept or reject the offer.

.

is preempted by federal legislation and imposes upon interstate commerce a burden impermissible under the commerce clause of the United States Constitution. The case was tried to the Court on November 19–21, 1979. Based upon the evidence adduced at trial, the post-trial memoranda of the parties, the pleadings, and the other materials now before it, the Court makes the following findings of fact and conclusions of law.

.    .    .    .    .

(3) The information to be filed with the division of securities and the target company pursuant to division (B)(1) of this section shall include:

(a) Copies of all . . . matter by means of which the offeror proposes to disclose to offerees all information material to a decision to accept or reject the offer;

(b) The identity and background of all persons on whose behalf the acquisition of any equity security of the target company has been or is to be effected;

(c) The source and amount of funds of other consideration used or to be used in acquiring any equity security . . .;

(d) A statement of any plans or proposals which the offeror, upon gaining control, may have to liquidate the target company, sell its assets, effect a merger or consolidation of it, or make any other major change in its business, corporate structure, management personnel, or policies of employment;

.    .    .    .    .

(g) Complete information on the organization and operations of offeror, including without limitation the year of organization, form of organization, jurisdiction in which it is organized, a description of each class of the offeror's capital stock and of its long term debt, financial statements for the current period and for the three most recent annual accounting periods, a brief description of the location and general character of the principal physical properties of the offeror and its subsidiaries, a description of pending legal proceedings other than routine litigation to which the offeror or any of its subsidiaries is a party and of which any of their property is the subject, a brief description of the business done and projected by the offeror and its subsidiaries and the general development of such business over the past five years, the names of all directors and executive officers together with biographical summaries of each for the preceding five years to date, and the approximate amount of any material interest, direct or indirect, of any of the directors or officers in any material transaction during the past three years, or in any proposed material transactions, to which the offeror or any of its subsidiaries was or is to be a party;

(h) Such other and further documents, exhibits, data, and information as may be required

*Findings of Fact*

Plaintiff AMCA, a wholly owned indirect subsidiary of Dominion Bridge Company, Limited,[2] is a Delaware corporation with its principal place of business in Hanover, New Hampshire. From modest beginnings in 1971 under the name Dombrico, Inc., AMCA has become a diversified operating company engaged in manufacturing and marketing

by regulations of the division of securities, or as may be necessary to make fair, full, and effective disclosure to offerees of all information material to a decision to accept or reject the offer.

(4) Any hearing pursuant to this section shall be held within forty days at the date a filing is made pursuant to division (B)(1) of this section. Adjudications made pursuant to this section shall be made within sixty days after such filing . . . .. If upon hearing the division finds that the take-over bid is in violation of Chapter 1707. of the Revised Code or that effective provision is not made for fair and full disclosure to offerees of all information material to a decision to accept or reject the offer, it shall so adjudicate. If it finds that the take-over bid would comply with this section if amended in certain respects, it shall so adjudicate. If it finds that the take-over bid is not in violation of Chapter 1707. of the Revised Code and that effective provision is made for fair and full disclosure to offerees of all information material to a decision to accept or reject the offer, it shall so adjudicate.

.    .    .    .    .

(C) [N]o offeror shall make a take-over bid which is not made to all holders residing in this state of the equity security that is the subject of such take-over bid, or which is not made to such holders on the same terms as such take-over bid is made to holders of such equity security not residing in this state.

.    .    .    .    .

Ohio Rev.Code Ann. § 1707.041 (Page 1978).

2. AMCA is a wholly-owned subsidiary of AMCA Netherlands, B.V., which in turn is wholly owned by Dominion Bridge Company, Limited [Dominion Bridge], a Canadian corporation headquartered in Montreal, Quebec. The shares of Dominion Bridge are traded on the Montreal and Toronto stock exchanges. Directly and through its subsidiary Algoma Steel Corporation, Canadian Pacific Investments Limited holds some sixty-five percent of Dominion Bridge. The ultimate parent is Canadian Pacific Limited, which own approximately seventy-five percent of the stock in Canadian Pacific Investments Limited. (Tr. 71, 73, 77, 80.)

industrial machinery, construction tools, specialty forgings, foam cushioning, and offshore mooring buoys (tr. 73–78). Its vigorous acquisitions policy contemplates acquiring companies in the odd-numbered years and integrating the new acquisitions in the even years (tr. 82). On September 14, 1979, the board of directors of AMCA approved the proposal of chairman and chief executive officer Kenneth S. Barclay that the company make a public tender offer of fifty-seven dollars per share for any and all shares of The Warner & Swasey Company [Warner & Swasey]. (Plaintiff's exhibit 26–Z, tr. 85, 224.)

Warner & Swasey, the target company is a publicly owned Ohio corporation with its principal place of business at Cleveland, Ohio, and more than three-fourths of its fixed assets located within this state (plaintiff's exhibit 12–B at 185–87). A manufacturer and distributor of industrial machinery and equipment, Warner & Swasey had net sales of over $245,000,000 in 1978 (defendant Warner & Swasey's exhibit J). Its common stock is registered with the Securities and Exchange Commission [SEC] pursuant to Section 12 of the Securities Exchange Act of 1934 [Exchange Act], 15 U.S.C. Section 78*l*, and is traded on the New York Stock Exchange (defendant Warner & Swasey's exhibits C–1, C–2). Warner & Swasey has approximately 7,581 shareholders of record for its 3,480,875 outstanding shares of common stock (plaintiff's exhibit 26–B). Some thirty-six percent of these shareholders, who hold some thirty percent of the outstanding common stock, are residents of Ohio (plaintiff's exhibit 12–B at 188).

Mr. Barclay became aware of Warner & Swasey as a desirable acquisition toward the end of 1978, through AMCA's acquisitions consultant, Mr. Royal Little (tr. 81). At Mr. Barclay's request, Mr. Little called upon officers of Warner & Swasey in June of 1979 to explore the possibility of acquisition; the officers were unresponsive (tr. 82–84). In the spring of 1979, not thinking particularly of Warner & Swasey, Mr. Barclay asked Mr. Frank J. Stevenson, AMCA's senior vice-president of finance, to secure

general acquisition financing in the approximate amount of $200,000,000 (tr. 84). Mr. Stevenson's efforts culminated in a revolving line of credit agreement for up to $126,-000,000 from a group of seven banks and a loan agreement for up to $70,000,000 from an affiliate of AMCA, both of which became effective September 1, 1979 (plaintiff's exhibits 26–BB, 27, tr. 171–72, 174).

Meanwhile, Mr. Barclay's inner reflections during the summer of 1979 led him to conclude that AMCA should attempt to acquire Warner & Swasey. He revealed his plan to Mr. Stevenson, Mr. William R. Holland, AMCA's senior vice-president of administration, and AMCA's attorneys and investment bankers on August 24, 1979. (Tr. 85.)

Shortly thereafter, the investment bankers, Salomon Brothers, prepared schedules that showed financial consequences to AMCA of a tender offer for Warner & Swasey at prices ranging from forty-five to seventy-five dollars per share (tr. 116). Salomon Brothers' fee was set at a minimum of $250,000 to a maximum of one million dollars if the proposed offer went forward (tr. 123–24).

A written report was prepared (plaintiff's exhibit 26–O) and presented on September 14, 1979, to a joint meeting of the boards of AMCA and Dominion Bridge that had been called especially to consider the acquisition of Warner & Swasey (tr. 141). The report, which was read aloud and distributed in written form, states that "[t]he tender offer will be made in accordance with the rules and regulations of the Securities and Exchange Commission and pursuant to any time requirements imposed by statutes" (plaintiff's exhibit 26–O at 11). The board members were told that the Ohio Act would be applicable to the takeover, and informed of the time requirements of the Act (tr. 143). The report did not explicitly identify the Ohio Act as a risk or cost associated with the proposed offer, not did it refer to litigation challenging the constitutionality of the Ohio Act; the board's approval of the proposed acquisition was not condi-

tioned upon a successful challenge to the Act (tr. 144, 323).

At the meeting on September 14, 1979, the board further authorized Mr. Barclay to divest AMCA of Insley Manufacturing Corporation on terms he deemed advisable (defendant Warner & Swasey's exhibit K) in order to forestall antitrust conflicts that might be created by the proposed acquisition of Warner & Swasey (tr. 347–48). Insley, whose net assets at time of disposition were $8,900,000, was sold on October 12, 1979 for $5,000,000 cash and a note of $2,500,000 (tr. 163, 350).

During the period of final preparations for the tender offer following approval by AMCA's board, the decision was taken to challenge the constitutionality of the Ohio Act (tr. 321).

On October 19, 1979, AMCA filed this action in the Southern District of Ohio, Eastern Division, for a declaration that the Ohio Act, O.R.C. Section 1707.041, is preempted by the Williams Act Amendments to the Securities Exchange Act of 1934, 15 U.S.C. Sections 78m(d)–(e), 78n(d)–(f) and violates the commerce clause of the United States Constitution, and seeking to enjoin its enforcement. That filing was the first announcement outside the corporate family of AMCA and Dominion Bridge that AMCA planned to make a tender offer for Warner & Swasey.

In its complaint, AMCA asserted its intention to tender for all outstanding shares of Warner & Swasey common stock at fifty-seven dollars per share promptly upon issuance of an injunction against enforcement of the Ohio Act (complaint ¶¶ 17, 19).

When it filed its complaint, AMCA also moved for a temporary restraining order and a preliminary injunction. At a conference on October 23, 1979, the Court set this matter for a full trial on the merits on November 19.

On October 24, 1979, AMCA filed under the Ohio Act, reserving its constitutional objections for decision by this Court after trial, in hope that defendant Commissioner Kenneth E. Krouse of the Ohio Division of Securities [Division] would decline to order a hearing and therefore render this action moot (plaintiff's exhibit 1, tr. 228–29). Those hopes were dashed, however, when Warner & Swasey on October 30 timely requested that the Division hold a hearing,[3] pursuant to the Ohio Act, and the Division declined, despite submission by AMCA of a hefty supplemental filing, to find that no cause for hearing existed (plaintiff's exhibits 3, 6, tr. 230–33). On November 5, the Division ordered a hearing which ran from November 12 to November 21. The decision of the Commissioner of Securities will be issued on December 24, 1979, the final day of the statutory period of sixty days that begins to run when the offeror files (plaintiff's exhibits 8, 9, tr. 391). The record of the hearing before the Division has been submitted into evidence in the instant action (plaintiff's exhibit 12; defendant Warner & Swasey's exhibit Q).

### Discussion

*Preemption*

This Court is now called upon to decide whether the Ohio Act is preempted by the Williams Act.[4] The inquiry is twofold. Did

---

3. Its retained investment banker, Kidder, Peabody & Company, had earlier advised Warner & Swasey that the offer of fifty-seven dollars per share was inadequate and that a substantially higher price could be obtained (plaintiff's exhibit 12G at 737–38). Subsequent events have confirmed Kidder, Peabody's judgment. After the conclusion of hearings before this Court but during the pendency of proceedings before the Division, the Bendix Corporation, a "white knight" endorsed by Warner & Swasey's board, made a competing offer of seventy dollars a share for forty-nine percent of the shares outstanding. AMCA responded by in-

creasing its proposed offering price to seventy-five dollars per share. Bendix rejoined the competition, offering eighty-three dollars per share for forty-nine percent. AMCA publicly announced on December 17, 1979 that it would not proceed with its seventy-five dollar offer, although it continues to regard Warner & Swasey highly. AMCA has not withdrawn from proceedings before the Division.

4. On December 6, 1979 the SEC published new rules governing tender offers, 44 Fed.Reg. 70,-326 (1979), which will not apply to the tender offer that is the subject of this action. Rule

Congress intend to preclude Ohio from concurrent regulation of tender offers? If Congress did not intend preemption, are there nevertheless conflicts between the Williams Act and the Ohio Act that prevent realization of the legislative goals that Congress intended to achieve?

The initial question is whether Congress has explicitly declared its intent to preempt state regulation of tender offers. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). The answer is negative; neither the Williams Act nor its legislative history contain language that expresses direct preemptive intent.

The inquiry continues: Despite the lack of explicit preemption, is preemptive intent nevertheless to be inferred from the nature and extent of federal regulation of tender offers? Preemption may be inferred when a "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973) (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). This Court does not find the Williams Act, with its moderate disclosure requirements and limited substantive protections for shareholders, to be sufficiently pervasive to preclude concurrent state regulation.

The Supreme Court has also found preemption when "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* There is an overriding federal interest in the spheres of foreign affairs and national security. *Pennsylvania v. Nelson*, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956); *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). By contrast, the coexistence of state and federal regulation of securities transactions is firmly established. *See, e. g., Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

The authority of the states to regulate securities transactions is explicitly underscored by the saving clause of the Exchange Act, Section 28(a), 15 U.S.C. Section 78bb(a):

> Nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder.

That language, although enacted in 1934, long before the advent of state tender offer regulation, has recently been construed, albeit in a somewhat different context, by the Supreme Court. *Leroy v. Great Western United Corporation*, 443 U.S. 173, 182 & n.13, 99 S.Ct. 2710, 2716 & n.13, 61 L.Ed.2d 464 (1979). The Court characterized Section 28(a) as "plainly intended to protect, rather than limit, state authority," noting that the legislative history of the Exchange

---

14d–2 will require a tender offeror to commence its offer within five days of its first announcement. The Ohio Act, which requires that the offeror defer commencement for at least twenty days after initial announcement, directly conflicts with the new federal regulation.

> The SEC has stated that
> the conflict between Rule 14d–2(b) and such state statutes is so direct and substantial as to make it impossible to comply with both sets of requirements as they presently exist. While recognizing its long and beneficial partnership with the states in the regulation of securities transactions, the Commission nevertheless believes that the state take-

over statutes presently in effect frustrate the operation and purposes of the Williams Act and that, based upon the abuses in current tender offer practice discussed above, Rule 14d–2(b) is necessary for the protection of investors and to achieve the purposes of the Williams Act.

Id. at 70, 329–30 [footnote deleted].

That the Ohio Act in its present form will indisputably be preempted when the new federal regulation becomes effective does not affect the duty of this Court to adjudicate the matter now before it; nor does that circumstance alter the Court's analysis and conclusions concerning the constitutionality of the Ohio Act as applied to this plaintiff.

Act refers to Section 28 as having as its purpose "to leave the States with as much leeway to regulate securities transactions as the Supremacy Clause [of the United States Constitution, Art. 6, cl. 2] would allow them in the absence of such a provision." *Id.* Congress has amended the Williams Act and other provisions of the Exchange Act on several occasions since Ohio adopted and applied its Act, without explicitly preempting state tender regulation or disturbing the original text of Section 28, which remains as it was enacted in 1934 (tr. 453–56).

Although this Court finds no congressional intent, explicit or implied, to preempt state regulation of tender offers, the Ohio Act might nevertheless be found to conflict in some or all of its provisions with federal law and therefore be preempted to the extent of that conflict.

■ The most patent sort of conflict occurs when simultaneous compliance with both federal and state regulations is impossible. In that event, "[a] holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design." *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). A close reading of the two statutes reveals, however, that it is possible for an offeror to comply with the Williams Act and the Ohio Act.

The Williams Act requires extensive disclosure of financial and organizational information by a tender offeror, that is, one who publicly solicits shareholders of a "target" corporation whose securities are registered under Section 12 of the Exchange Act, 15 U.S.C. Section 78*l*, to tender their shares to the offeror at a specified price.

Pursuant to Section 14(d) of the Williams Act, 15 U.S.C. Section 78n(d), and regulations adopted thereunder, an offeror must file and communicate to shareholders of the target company information that includes the offeror's identity and financial characteristics, the amount and source of funds for the offer, any plans of the offeror to alter the target's organization or operations, potential legal conflicts created by the offer, and other facts material to a shareholder's decision whether to tender his shares.[5]

The Ohio Act, set out in the margin at footnote 1, differs from the Williams Act in several significant respects. The Ohio Act applies when the target is an Ohio corporation or a foreign corporation that has its principal place of business and substantial assets in Ohio, regardless of number of shareholders, magnitude of assets, or trading market. O.R.C. Section 1707.041(A)(1). Thus, the Ohio Act has a broader reach than the Williams Act.[6] The Ohio Act nevertheless exempts from its operation "friendly" or "negotiated" tender offers in which the target's board of directors recommends acceptance to the shareholders.

If the target's board is neutral or hostile, then the offeror must publicly announce the terms of the offer and file with the Division detailed information specified in the Act. The filing initiates a ten day period during which the target may request a hearing or the Division, sua sponte, may order a hearing. If the target makes a request but the Division finds that no cause for hearing exists, no hearing is held and the offer may go forward twenty days after the offeror filed. If a hearing is convened it must be

5. In addition to its disclosure provisions, the Williams Act allows shareholders certain rights of withdrawal of previously tendered stock, 15 U.S.C. Section 78n(d)(5), requires pro rata purchase under specified circumstances, Section 78n(d)(6), and provides that later price increases must be paid to shareholders who tendered at a lower price, Section 78n(d)(7). The Ohio Act establishes comparable requirements for pro rata purchases and price increases, O.R.C. Section 1707.041(C), and is silent concerning withdrawal of tendered securities. The Ohio Act does, however, require that an offer be

made to all shareholders of the target who are Ohio residents, on the same terms as made to nonresident shareholders. *Id.*

6. The Ohio Act is narrower in one respect: it establishes a threshold of ten percent ownership upon completion of the acquisition, while the Williams Act becomes operative if the offeror would achieve more than five percent ownership of the subject class of securities following the tender. O.R.C. § 1707.041(A)(1); 15 U.S.C. §§ 78m(d)(1), 78n(d)(1).

completed within forty days of the filing. Adjudication following a hearing must be made within sixty days of filing. The Ohio Act thus precludes surprise to target management or the trading market. The Williams Act, however, does not require the offeror to announce its intentions in advance; the necessary filing may be made contemporaneously with the offer.

The Ohio statute goes beyond the Williams Act to require even more comprehensive revelation by the offeror of its capitalization, financial statements, pending nonroutine litigation, and other matters that may be required to achieve fair and effective disclosure to offerees. O.R.C. Sections 1707.041(B)(3)(g) and (h).

Disclosures made under the Williams Act are not evaluated by the SEC with respect to substantive fairness. Under the Ohio Act, however, the discretionary administrative inquiry addresses the fairness of both disclosures to offerees and the substance of the offer itself. O.R.C. Section 1707.-041(B)(4); see O.R.C. Section 1707.13. To summarize, the Ohio Act differs from the Williams Act primarily in that it requires fuller disclosure, imposes administrative review, extends the period of public scrutiny, and requires that the tender offer be made on the same terms to Ohio shareholders as to others. An offeror who proceeds under the Ohio Act encounters no proscriptions of the Williams Act and is not hindered from meeting its obligations under the federal statute.

However, preemption may occur without literal impossibility of simultaneous compliance with state and federal law. The more fundamental question, posed by the Supreme Court in *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), is "whether, under the circumstances of this particular case, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." In conducting its inquiry this Court must "consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Jones v. Rath*

*Packing Co.*, 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977).

It is undisputed that "the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). The controversy in this action centers around whether, in the words of the Court of Appeals for the Fifth Circuit, "Congress relied upon a 'market approach' to investor protection." *Great Western United Corporation v. Kidwell*, 577 F.2d 1256, 1276 (CA 5 1978), *rev'd on grounds of improper venue sub nom. Leroy v. Great Western United Corporation*, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). Plaintiff AMCA argues, as did the offeror in *Piper*, that Congress, in adopting the Williams Act, intended to create affirmative regulatory neutrality between tender offerors and target management.

The *Piper* court rejected that argument decisively:

Congress was indeed committed to a policy of neutrality in contests for control, but its policy of evenhandedness does not go either to the purpose of the legislation or to whether a private right of action is implicit in the statute. Neutrality is, rather, but one characteristic of legislation directed toward a different purpose—the protection of investors. Indeed, the statements concerning the need for Congress to maintain a neutral posture in takeover attempts are contained in the section of the Senate Report entitled, "Protection of Investors." Taken in their totality, these statements confirm that what Congress had in mind was the protection of shareholders, the "pawn[s] in a form of industrial warfare."

The Senate Report expressed the purpose as "plac[ing] investors on an equal footing with the takeover bidder," . . . without favoring either the tender offeror or existing management.

This express policy of neutrality scarcely suggests an intent to confer highly important, new rights upon the class of

participants whose activities prompted the legislation in the first instance.

430 U.S. at 29–30, 97 S.Ct. at 943.

██ In *Piper* the issue before the Court was whether a tender offeror regulated by the Williams Act had a right of action for damages on the claim that antifraud violations by other regulated parties thwarted its takeover attempt. 430 U.S. at 24, 97 S.Ct. 926. In the instant action, plaintiff AMCA asserts that "its right under the Williams Act to make its tender offer at a premium above the market price to shareholders of Warner & Swasey who reside throughout the United States," complaint ¶ 37(a), is infringed by enforcement of the Ohio Act (complaint at ¶ 37(a)). Despite the difference in the issues presented for decision, the reasoning of the Court in *Piper* leads this Court to conclude that the Williams Act accords no "right" to a tender offeror to make an offer, much less to succeed in consummating it. The shareholders of the target corporation are the intended beneficiaries of the Williams Act; it is to the protection of *their* interests that this Court must look in determining whether the Ohio Act obstructs achievement of the congressional purpose.

The Ohio Act has as its stated, albeit uncodified, purpose, "to protect shareholders of Ohio and Ohio based corporations by requiring public announcement and fair, full, and effective disclosure to shareholders in regard to takeover bids." Amend.Sub. S.B. No. 138, File No. 90, at 1 (Reg.Sess. 1969–70). That the purpose of the Ohio Act is consonant with the *purpose* of the federal Williams Act does not satisfy the *Hines* test; this Court must ask whether the Ohio Act has the *effect* of frustrating congressional policy. *Perez v. Campbell*, 402 U.S. 637, 650, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971).

Congress might rationally have believed that the relatively restrained approach of the Williams Act was the appropriate federal regulatory posture and at the same time have felt that the states should be allowed to regulate more actively if they chose to, with the caveat that takeovers offer poten-

tial economic benefits and should not be inhibited unduly. *See Piper*, 430 U.S. at 30, 97 S.Ct. 926. Thus, the Court must inquire whether there is evidence that the Ohio Act impermissibly discourages tender offers. Writing in 1970, when both the Williams Act and the Ohio Act were in their infancy, Professor Shipman observed:

> Takeover legislation may be framed in terms of investor protection standards, which is true of the [Ohio] Act and the Williams Bill, and does increase the information available to security holders. One almost inevitable effect of such legislation is, however, to increase management's tenure protections. Opponents of takeover legislation deplore the anti-Darwinism. They also point out that investors may lose when takeover bids are regulated, even by benign means such as disclosure. The takeover bid represents a means of disposition alternative to the market and usually at a higher price. To the takeover bidder, any regulation of his bid discourages, and the benefit to security holders of even the mild regulation established by the Williams Bill may be outweighed by the value of takeover bids that may never be conceived or completed because of such regulation.

Shipman, *Some Thoughts About the Role of State Takeover Legislation: The Ohio Takeover Act*, 21 Case W. Res. L. Rev. 722, 725 (1970).

The Court acknowledges that the benefits to shareholders of tender offer regulation, federal or state, are inevitably accompanied by costs. There is nothing in the record before us, however, to support a finding that the comparative costs and benefits under the Ohio Act differ materially from their analogs under the Williams Act, much less that any difference is an obstacle to effectuation of congressional aims.

The Ohio Act, one of the earliest of the state statutes regulating tender offers, took effect October 9, 1969, slightly more than one year after Congress enacted the Williams Act. During the past decade the Division has had ample opportunity to apply the Ohio Act.

The proposed tender offer of AMCA is the seventeenth formal filing with the Division under the Act; in three additional cases the Act has been invoked in enforcement proceedings and no filing was made (defendant Warner & Swasey's exhibits C–1, C-2, tr. 517–47, 560). In twelve cases there was a formal filing and jurisdiction of the Division under the statute was found to be proper; of these, three offerors withdrew, four offerors completed their offers, and five targets were the subject of successful competing offers (defendant Warner & Swasey's exhibits C–1, C–2, tr. 517–47). It does not appear from the record that the three withdrawals were provoked by the Ohio Act. In the remaining nine cases, shareholders of the target company entertained either the original offer or a competing offer at a higher price (defendant Warner & Swasey's exhibits B, C–1, C–2).

The foregoing results under the Ohio Act scarcely indicate that tender offers have been unduly inhibited by the Ohio Act. Because only "hostile" offers are subject to regulation, the Division's records do not reflect the effect of the Act upon "friendly" offers. The Court does not find in the record evidence to show how many "friendly" offers have been consummated in Ohio outside the Act, nor on what terms. It is certainly possible that potential bidders, rather than being discouraged from making tender offers, have been influenced by the Ohio Act to negotiate with incumbent management or to select an alternative target whose management is more receptive.

The purpose of the Williams Act, as plainly expressed in congressional deliberations and interpreted by the Supreme Court in *Piper*, is to protect investors through full and fair disclosure. The Ohio Act has contributed to investor protection by imposing closer scrutiny upon offers that target management, bound by strict fiduciary duties, has not endorsed.

The Court finds that the Ohio Act does not conflict with the Williams Act in its operations, and that Congress did not evidence a desire to restrict nonconflicting state takeover legislation. Accordingly, the Court holds that the Ohio Act has not been preempted by federal law.

### The Commerce Clause

Plaintiff AMCA further calls upon this Court to determine whether the Ohio Act stands in violation of the commerce clause of the United States Constitution. The rule that governs our consideration has been stated by the Supreme Court in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

> Where the [state] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

Although the Ohio Act distinguishes between "friendly" and "hostile" offerors, it is nevertheless evenhanded for purposes of the *Pike* analysis in that it applies to all "hostile" offerors regardless of residence. The Act by its terms applies to Ohio bidders and foreign bidders alike. Moreover, there appears to be no evidence that the Division has treated foreign offerors differently from Ohio offerors, either in procedural matters or in substantive adjudication.

That the Ohio Act regulates "hostile" but not "friendly" tenders does not defeat evenhandedness; "friendly" offers are scrutinized by management in the exercise of its fiduciary duty, while hostile offers are subject to surrogate review by the state administrative agency. The state's regulatory interests are equally strong for "friendly" takeovers, but the state is able to serve those interests effectively with a lesser expenditure of public resources through target management's review and recommendation.

Proceeding to the next point of the *Pike* analysis, the Court believes that Ohio has abundant legitimate public interest in regulating a proposed tender offer for Warner and Swasey, an Ohio corporation with its principal place of business, the main part of its assets, and approximately one-third of its shareholders in Ohio.[7] Tender offers profoundly affect corporate internal affairs and fiduciary relationships traditionally within the purview of state regulation. The Court is persuaded that tender offers are to be considered functionally as internal affairs transactions, comparable to proxy contests and mergers, in which a state possesses a compelling interest: investor protection. *See Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); Shipman, *Some Thoughts About the Role of State Takeover Legislation: The Ohio Takeover Act*, 21 Case W. Res. L. Rev. 722, 741–45 (1970). Such regulation, and thus such protection, necessarily embraces nonresident shareholders of an Ohio corporation as an incidental aspect of effectively protecting Ohio resident shareholders. In the view of this Court, a "legitimate local public interest" need not be exclusively local to pass muster under *Pike*.

Having determined that the Ohio Act possesses a legitimate local purpose, the Court must assess whether it imposes upon interstate commerce any burdens that clearly outweigh the local benefits. We look first to the effect of the Ohio Act upon regulated tender offerors. Any regulation exacts economic costs from the regulated: out-of-pocket outlays and potential gains prevented.[8]

Plaintiff asserts that its out-of-pocket costs of compliance with the Ohio Act include over one hundred thousand dollars in

personnel and office expense and $453,000 in loan commitment fees (tr. 178, 182–83). The former expenses, concededly arising from Ohio regulation, cannot be considered overly burdensome when they are compared with the magnitude of the contemplated purchase price—well over $200,000,000—and the other costs of its execution, including disposition of Insley Manufacturing Corporation at an after-tax loss of $1,000,000 (tr. 351) and fees to Salomon Brothers of at least $250,000 (tr. 123–24).

The loan commitment expense, however, was incurred by AMCA on September 1, 1979, at a time when its board of directors had not even authorized a tender offer for Warner & Swasey (tr. at 174; 197–98). Although that authorization was given on September 14, AMCA did not announce its intention to acquire Warner & Swasey and seek to enjoin enforcement of the Ohio Act until October 19 (tr. 354). Moreover, under the agreements with its lenders, AMCA is required to pay loan commitment fees until such time as it borrows the principal amount of the prospective loan and pays interest in an amount at least equal to the commitment fees (plaintiff's exhibit 1 at 9, tr. 174–80). When this action went to trial on November 19, 1979, AMCA could not have consummated its purchase of Warner & Swasey shares (and thus shed its loan commitment obligations) quite apart from the Ohio Act, because the Federal Trade Commission had not completed its consideration of the antitrust implications of the proposed tender offer pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. Section 18a (tr. 178–80; 188).[9] Accordingly, it is inappropriate to attribute the loan commitment fees to the Ohio Act alone. These fees must be sub-

---

7. The Court declines to speculate whether Ohio's interest is as intense when the target is not incorporated in Ohio.

8. As one commentator recently observed,

[u]nder a commerce clause analysis, the critical inquiry is the cost and effects of *compliance* with the challenged regulation, not the obviously more burdensome effects of *noncompliance*. Indeed, if the effects of noncompliance were typically balanced against

the benefits of state regulation, it would be a rare state statute that survived the commerce clause test . . . .

Note, *The Constitutionality of State Takeover Statutes: A Response to Great Western*, 53 N.Y.U.L.Rev. 872, 923 (1978).

9. It has been brought to the attention of the Court that the Federal Trade Commission has now completed its consideration of the proposed tender offer.

sumed under general business expense in an area subject to regulation by federal and state government.

AMCA further contends that the Ohio Act imposes impermissible costs in the form of gains prevented. Specifically, AMCA claims to have been deprived of income amounting to $1.5 million per month that it would be earning if it had been able to take over Warner & Swasey as it had originally planned (tr. 183). At the time this case was heard, however, the Ohio Act was not the sole obstacle to AMCA's enjoyment of the benefits of investment in Warner & Swasey, for the pendency of the Hart-Scott-Rodino proceedings prevented consummation of the offer.

AMCA's fundamental concern is clearly for the extended period of public exposure to which proposed tender offers are subjected under the Ohio Act. During the twenty to sixty days when an announced "hostile" offer is before the Division, complex market forces come into play. Other bidders may enter the contest at the invitation of target management or on their own initiative; the original offeror may be put to the choice of increasing its offering price or withdrawing from the competition. In either event it may suffer gains prevented.

Experience under the Ohio Act has shown, however, that the original offeror's loss is often a subsequent offeror's and the securityholders' gain (defendant Warner & Swasey's exhibits B, C–1, C–2). When there has been a competing bid while the original offer has been under administrative review, the Ohio Division of Securities has permitted the original offeror to engage in responsive bidding (tr. 520, 535). Although it does not appear from the record that any offeror has availed itself of this permission, the Division's policy further indicates to the Court that the Ohio Act as it has been applied during the past decade does not prevent accomplishment of tender offers on economically sound terms that are fair to both the shareholders and the acquiring entity. The costs to a specific regulated entity of any delays imposed by the nondiscriminatory Ohio Act are largely conjectural; the Court is unpersuaded that such costs impose a significant burden upon interstate commerce.

Because Warner & Swasey is an Ohio corporation with its principal place of business and the bulk of its assets in Ohio, there is no other state whose takeover statute might apply to the proposed transaction. Moreover, there appears to be no conflict between the Ohio Act and the blue sky laws of sister states. See Shipman, *Some Thoughts About the Role of State Takeover Legislation: The Ohio Takeover Act*, 21 Case W. Res. L. Rev. 722, 748 (1970).

The Ohio Act does not operate in favor of Ohio, to the economic detriment of other states. Ohio's legislature does not seek to divert business from another jurisdiction to Ohio, or to prevent business from flowing to other states. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed.2d 1447 (1947). Thus, it does not appear that the Ohio Act burdens interstate commerce by generating conflicts with the regulations of sister states or discriminating against the economic interests of citizens of states other than Ohio.

The Court, noting that the effects of the Ohio Act upon the totality of interstate commerce are not easily isolated, nevertheless observes that trading activity on the New York Stock Exchange for Warner & Swasey's shares was significantly enhanced as soon as the proposed tender offer was made public, and that the increased price and volume activity persisted despite the pendency of Ohio proceedings (defendant Warner & Swasey's exhibits H, I). Such activity scarcely reflects an inhibition of interstate commerce.

The Court finds scant merit in AMCA's contention that the Ohio Act stands as a barrier to the injection of some $200,000,-000.00 into interstate commerce. It is certainly true that regulatory constraints influence the choice among investment opportunities, and, if sufficiently onerous, may deter investment significantly. The record, however, shows that AMCA is an aggres-

sively expanding company that will assuredly elect an alternative investment of its resources, should it fail to complete the proposed offer for Warner & Swasey. Indeed, on July 23, 1979 AMCA's board of directors approved $126,000,000 in financing for a new acquisition—long before it was informed of the identity of the target, and consequently without regard for the possibility of Ohio regulation (plaintiff's exhibit 26–DD).

The Ohio Act, like any regulation, affects commerce and imposes costs upon regulated parties. Nevertheless, the Court, having reviewed the record in this action, is unable to find that the Act imposes upon interstate commerce a burden that is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Accordingly, the Ohio Act does not violate the commerce clause of the United States Constitution and must be upheld.

### Conclusions of Law

The Court has jurisdiction of this matter pursuant to 28 U.S.C. Sections 1331(a) and 1343.

The Ohio statute that governs tender offers, Section 1707.041 of the Ohio Revised Code, has not been preempted by federal law and does not impose an impermissible burden upon interstate commerce in violation of the commerce clause of the United States Constitution. The statute may be enforced against the plaintiff.

WHEREUPON, IT IS HEREBY ORDERED THAT the Clerk shall enter final judgment in favor of the defendants.