618 F.2d 1029
 Fed. Sec. L. Rep. P 97,329
TELVEST, INC., a Delaware Corporation, Appellee,
v.
Junie L. BRADSHAW, Thomas P. Harwood, Preston C. Shannon,
Commissioners of the Virginia State Corporation Commission;
Lewis W. Brothers, Jr., Director, Division of Securities and
Retail Franchising, Appellants,
and
American Furniture Company, Inc., Intervenor-Defendant.
TELVEST, INC., a Delaware Corporation, Appellee,
v.
Junie L. BRADSHAW, Thomas P. Harwood, Preston C. Shannon,
Commissioners of the Virginia State Corporation Commission;
Lewis W. Brothers, Jr., Director, Division of Securities and
Retail Franchising, Defendants.
Appeal of AMERICAN FURNITURE COMPANY, INC.
 Nos. 79-1568, 79-1569.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 4, 1979.
Decided March 26, 1980.
Rehearing Denied April 29, 1980.
 
 James E. Farnham, Richmond, Va. (Robert P. Buford, Lathan M. Ewers, Jr., Edgar M. Roach, Jr., Hunton & Williams, Richmond, Va., on brief), for appellant, American Furniture Co., Inc.
 James E. Moore, Asst. Atty. Gen., Richmond, Va. (Richard D. Rogers, Jr., Lewis S. Minter, Joel H. Peck, Donald G. Owens, State Corp. Commission of Virginia, Richmond, Va., on brief), for State Corp. Commission, appellants.
 John F. Kay, Jr., Richmond, Va. (F. Claiborne Johnston, Jr., Anthony F. Troy, Joseph R. Mays, Mays, Valentine, Davenport & Moore, Richmond, Va., Nathan H. Dardick, Chicago, Ill., on brief), for appellee.
 Ralph C. Ferrara, Gen. Counsel, Robert C. Pozen, Associate Gen. Counsel, William A. Dietch, Asst. Gen. Counsel, Stephen P. Lamb, Sp. Counsel, Bruce Rinaldi, David Sirignano, Securities and Exchange Commission, Washington, D. C., on brief, as amicus curiae.
 Before BUTZNER and WIDENER, Circuit Judges, THOMSEN, Senior District Judge.*
 WIDENER, Circuit Judge:
 
 
 1
 Appellants, Junie L. Bradshaw, Thomas P. Harwood, Preston C. Shannon, Commissioners of the Virginia State Corporation Commission, and Lewis W. Brothers, Jr., Director of its Division of Securities and Retail Financing (all herein referred to as the Commission), and American Furniture Company (American) appeal the issuance of a preliminary injunction in favor of Telvest, Inc. by the United States District Court for the Eastern District of Virginia at Richmond. We are persuaded that the injunction was improvidently issued, and reverse the order of the district court granting the injunction.
 
 
 2
 Telvest, Inc., plaintiff below and appellee here, sued in the district court seeking injunctive and declaratory relief, contending a 1979 amendment to the Virginia Take-Over-Bid Disclosure Act[1] to be unconstitutional. After a hearing, the district court granted Telvest a temporary injunction, enjoining the enforcement of the 1979 amendment. While it did not in terms find the Virginia statute to be unconstitutional, such is implicit from its opinion.
 
 
 3
 In 1968 Virginia enacted a Take-Over-Bid Disclosure Act, Va.Code Ann. §§ 13.1-528 to 13.1-541, establishing procedural and disclosure requirements applicable to take-over bids made for any corporation incorporated under Virginia law and doing business in Virginia. A take-over bid under the act is defined as an offer, other than an exempt offer, made to purchase shares of a company that would give the purchaser, in the aggregate, more than 10% of the company's stock.[2]
 
 
 4
 If a purchaser falls within the take-over bid provisions of the act, certain procedures[3] must be followed to protect the target company's shareholders, investors, and the public. Shares deposited pursuant to such a bid may be withdrawn at any time within seven days from the offer or after 60 days if the offeror has not taken up the shares. If more shares are tendered than desired, they must be purchased on a pro rata basis. If the purchaser increases the consideration during the take-over period, the consideration for all shares must be increased, including those already purchased. A disclosure form and all solicitation materials must be filed with the Commission prior to the take-over bid.
 
 
 5
 Open market purchases[4] such as the ones previously made here by Telvest were originally exempt from the take-over bid provisions of the 1968 Act. In July 1979, however, a new provision of the Virginia act became effective,[5] which the Commission describes as an effort to regulate "creeping tender offers." That provision limited previously exempt open market purchases of stock by making non-exempt open market purchases if the purchaser had acquired more than one percentage of the outstanding shares of the class within the preceding six months. If the purchase at hand and the purchaser's other stock aggregated more than ten percent of such shares, then the take-over bid provisions of the statute came into effect. So, the restriction of the 1979 amendment was very narrow. To purchase more stock than 1% per six-month period through the open market, the purchaser can now seek an exemption from the State Corporation Commission by showing that it is not the purpose or effect of the offer to change or influence control of the target corporation.[6] Once such an exemption is obtained, the purchaser is allowed to proceed with his offer through the open market without complying with the take-over-bid provisions. If a purchaser wishes to take control and therefore cannot obtain an exemption from the Commission, the purchaser must either restrict his purchases so that they are more than six months apart, or purchase less than 1% in a six-month period, or comply with the requirements of the take-over-bid provisions if the aggregate amount of his stock following the purchase in question will exceed 10%.
 
 
 6
 The Williams Act[7] amendments to the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., were enacted by Congress in 1968 to deal with the "growing use of cash tender offers as a means for achieving corporate take overs." Like the Virginia statute complained of, its purpose was to protect "the (stockholders) of the target corporation." (Italics in original). Piper v. Chris-Craft Ind. Inc., 430 U.S. 1, 22, 39, 97 S.Ct. 926, 939, 948, 51 L.Ed.2d 124 (1977). Under § 13(d)(1) of the Williams Act, 15 U.S.C. § 78m(d) (1), anyone acquiring more than 5% of the stock of a company must file a disclosure form with the SEC. The form must be filed within ten days after the stock acquisition. Those Schedule 13D forms must be filed regardless of how the 5% of the stock is acquired. Thus, purchasers through the open market must file Schedule 13D forms. In no other way, however, does the Williams Act regulate open market transactions so far as the purchase and sale of the security is concerned, which does not imply that the statute requires no other duties.
 
 
 7
 The Williams Act also sets out procedural and disclosure requirements for tender-offer purchases. Tender offers are not defined in the act, however. Any person making a tender offer for any class of covered securities through the mails, interstate commerce, or any facility of a national securities exchange must file with the SEC a Schedule 14D-1 form if the purchaser, in the aggregate, will own more than 5% of the class of stock sought after the consummation of the offer. 15 U.S.C. § 78n(d)(1).
 
 
 8
 Like the Virginia Act, the Williams Act contains procedures for the withdrawal of securities by the holder (§ 78n(d)(5)), the pro rata purchase of securities if more is offered than sought by the offeror (§ 78n(d)(6)), and the increase of consideration for all security holders whose securities are taken up should the consideration offered be increased during the tender-offer period (§ 78n (d)(7)). The act also prohibits the use of any false or misleading statements during the tender offer period (§ 78n(e)).
 
 
 9
 In late 1978, Telvest, a Delaware corporation, began purchasing stock in American Furniture, a Virginia corporation, through the open market. By May 1979, Telvest had acquired 5% of American's stock. Thereupon, Telvest filed the necessary Schedule 13D forms with the SEC under the Williams Act. By August 1979, Telvest had acquired 9.9% of American's stock, the Commission in the meantime, in July, having advised Telvest of the 1979 Virginia amendment and its options under it.
 
 
 10
 Telvest did not seek an exemption under the act but sued the Commission in the district court, seeking to have the 1979 amendment held unconstitutional on preemption, supremacy clause, and commerce clause grounds. Telvest argued that Congress, through the Williams Act, intended that no restraint be placed upon open market purchases; therefore, Virginia could not validly limit such purchases by the 1979 amendment. Conversely, American, which intervened, and the Commission contended that Virginia was merely regulating an area outside the scope of the Williams Act, so that no preemption problem arose. As noted, the district court granted a temporary injunction enjoining enforcement of the 1979 amendment to the Virginia take-over bid act or any other state statute or regulation applicable to Telvest's open market purchases of American stock made under the exemption to the take-over bid statute as it existed prior to the 1979 amendment.
 
 
 11
 On appeal, American and the Commission contend that the district court erred by failing to consider properly the harm to the defendants and by considering the likelihood of success on the merits before considering the question of irreparable harm. They further claim error in that the district court did not properly consider the public interest in its decision to issue the injunction and that no necessary conflict exists between the State and federal statutes.
 
 
 12
 The issue before us, strictly speaking, is not whether the 1979 amendment is unconstitutional, rather whether the district court erred in granting the temporary injunction enjoining the enforcement of the 1979 amendment until a decision on the merits was reached.
 
 
 13
 The standard in this circuit when considering whether to issue a temporary injunction is the balance-of-hardship test. Maryland Undercoating Co. v. Payne, 603 F.2d 477 (4th Cir. 1979); Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189 (4th Cir. 1977). Under this test, the decision of the district court must be based upon a flexible interplay of the four factors to be considered: (1) the likelihood of irreparable harm to the plaintiff without the temporary injunction; (2) the likelihood of harm to the defendant with the injunction; (3) plaintiff's likelihood of success on the merits; and (4) the public interest.
 
 
 14
 The district court is first to balance the likelihood of harm to the plaintiff if the temporary injunction is not issued against the likelihood of harm to the defendant if the temporary injunction is issued. If the harm to the plaintiff greatly outweighs the harm to the defendant, then enough of a showing has been made to permit the issuance of an injunction, and plaintiff need not show a likelihood of success on the merits, for a grave or serious question is sufficient. But as the harm to the plaintiff decreases, when balanced against the harm to the defendant, the likelihood of success on the merits becomes important. However, the first step is the balancing of the harm to the parties.
 
 
 15
 While the district court in its oral opinion did mention the harm to the parties, the likelihood of success of the plaintiff, and the public interest, it did not balance the likelihood of harm to the defendants if an injunction were issued against the likelihood of harm to the plaintiff if an injunction were not issued, perhaps because it found that harm to the defendants would be nonexistent.
 
 
 16
 Its opinion was keyed largely to the likelihood of success on the merits by the plaintiff. It found that the State and federal statutes were in conflict, that Congress had preempted the field, and that the State statute was an impermissible burden on interstate commerce. It also found that irreparable harm would result to the plaintiff if a preliminary injunction were denied, but did not state how such irreparable harm would take place, and found that the likelihood of harm to the defendants if a preliminary injunction were granted to be "non-existing." It further found that the public interest was best protected by permitting plaintiff to make purchases of stock through the open market, by the operation of a securities market as contemplated by Congress, and by the maintenance of a free and open securities market. At no place did the district court consider the effect of a take-over bid on the other stockholders of American whose interest we think may certainly be considered to be the same as that of the Commission, for they are in terms included among those protected by the statute. Va.Code Ann. § 13.1-528(B).
 
 
 17
 The district court recited that the state and federal statutes were in conflict in more than one place, but it pointed with particularity only to a conflict between Regulation T of the SEC and the Virginia statute. Regulation T, 12 CFR 220.3(b)(1), provides that payment of cash and delivery of securities sufficient to satisfy margin requirements must be made within five days, while the Virginia statute interposes a seven-day right of withdrawal for all selling shareholders under the take-over bid disclosure act, Va.Code Ann. § 13.1-530(b). What the district court did not take into account is the fact that the Williams Act has precisely the same seven-day right of withdrawal (15 U.S.C. § 78n(d)(5)). So, in the event of a tender offer, the variation in the method of payment under federal law and under State law is the same and Regulation T will be affected the same way by either statute. The district court did not consider the presumption of validity of State statutes nor the rule that if a statute can be construed in one way as constitutional and in another way unconstitutional, it should be construed in the constitutional way. Graham v. Richardson, 403 U.S. 365, 382-83, 91 S.Ct. 1848, 1857, 29 L.Ed.2d 534 (1971). Construing the Virginia statute so that it prohibits acquisition of publicly traded stocks in excess of 10% except by way of tender offer, or at the rate of 1% in a six-month period, might not, then necessarily leave any conflict in this aspect of the case. For if Telvest made a tender offer in fact, it would be at once subject to the provisions of both federal and state law with the same seven-day withdrawal privilege in each statute.
 
 
 18
 With further reference to the Williams Act seven-day right of withdrawal, we note that some unconventional tender offers, subject to the Williams Act, involve open market purchases. See, e. g. S-G Securities, Inc. v. Fuqua Investment Company, 466 F.Supp. 1114 (D.Mass.1978). In this event, any problems caused by the difference between the times provided by Regulation T and the withdrawal provisions of both the Virginia Act and the Williams Act would be essentially similar. The conflict with Regulation T, perceived by the district court, if indeed it exists, is not peculiar to the Virginia Act, and it appears to lend little support to the plaintiffs' claim that they ultimately will prevail.
 
 
 19
 Neither did the district court consider that the Virginia statute "is to protect the interests of offerees, investors, and the public by requiring that an offeror make fair, full, and effective disclosure to offerees of all information material to a decision to accept or reject a take-over bid." Va.Code Ann. § 13.1-528(B). Doubtless, most of the holders of American stock had invested in that company on the faith of its then present management, or had held their stock with knowledge of it. While we do not base our opinion on any rights the present management may have, we think the entire purpose of the Virginia Take-Over-Bid Disclosure Act has not been shown to be other than to protect the interests of offerees, investors, and the public. Again as we have stated before, the purpose of the Virginia statute seems consistent with, rather than antagonistic to, the purpose of the Williams Act. See Piper, 430 U.S. p. 38, 97 S.Ct. p. 947.
 
 
 20
 With these thoughts in mind, we conclude that the district court did not consider what effect its injunction might have on the other stockholders of American if this presumptively valid statute were upheld. While that court relied on the representation of Telvest "not to gain control but to simply acquire through normal public markets approximately 22% of the outstanding shares," we think it is remarkable that Telvest, although offered the opportunity, refuses to make such representation to this court. The Virginia statute, § 13.1-529(i), creates at least a presumption that the ownership of stock in excess of 10% in a company whose stock is publicly traded represents an effort to take over control of the company. Indeed, the Williams Act itself, 15 U.S.C. § 78n(d)(1), acknowledges much the same thing, for its disclosure provisions are made effective upon the ownership of 5% of the stock, and this construction is made apparent by its legislative history. 1970 U.S.Code Cong. & Admin.News, p. 5025 et seq.; 1968 U.S.Code Cong. & Admin.News, p. 2811 et seq. Thus, it is not unreasonable to assume at least at this stage of this proceeding and on this record that Telvest does in fact intend to acquire control of American; at least it must be so assumed in considering the potential harm to the other shareholders of American.
 
 
 21
 The result of the district court's injunction could only have been to allow Telvest to continue to acquire shares in American untrammeled by the disclosure provisions of the Virginia statute. Likewise, Telvest would not be limited to acquiring no more than 1% American's shares per six-month period without making a tender offer. If Telvest were permitted to continue its acquisition of shares in violation of State law, and the State law were upheld, then it might easily have acquired effective control of American in violation of the positive command of a State statute by virtue of the injunction.
 
 
 22
 While it may even be true, and we express no opinion on the question, that Telvest management of American may be more efficient than the present management, nevertheless, the owners of American, and we refer to its stockholders, not its management, are, under State law, entitled to the disclosure of the information required by the State statute, as well as being entitled to the benefits of a tender offer under State law. The denial to the stockholders of American of the disclosure of the information, as well as the denial to them of the other substantial benefits of a tender offer, can only be considered harmful, and we think it error on the part of the district court to find the potential harm to the defendants to be non-existing in the face of this set of facts. Any harm to the other stockholders, indeed, would be perpetuated if Telvest were to obtain control by virtue of the injunction. Compared to this harm, which may well take place, the potential harm to Telvest is no more, and probably less, certain, if the injunction were denied. The only harm to Telvest is the denial of its right to acquire on the open market shares of American not subject to the requirements of the Virginia statute. If it does not seek control of American, it may seek an exemption under Virginia law and proceed with its acquisition of shares. While the district court described the exemption procedure as too time consuming, such is not readily apparent. The Commission advised Telvest by letter on July 20, 1979 of the application of the 1979 amendment to the Virginia statute because of articles appearing in the news media concerning the Telvest purchase of American stock. Instead of applying for an exemption under State law, the time for processing which is rather strictly circumscribed by statute, Telvest chose to commence this lawsuit, and while this was its right, it was bound to have known that litigation of the present nature is at the very least quite time consuming.
 
 
 23
 While it is not stressed by the parties, nor addressed by the district court, we can imagine, for example, that a potential conflict between State and federal law may exist in the opportunity given under Virginia law, § 13.1-531, for a hearing upon notice of a take-over bid, which opportunity is not given by the Williams Act.[8] At this stage of this proceeding, however, we are unable to say that any such conflict does exist, for, as we have before noted, the States have not been precluded from legislating in the securities field, state blue sky laws being a perfect example. Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480 (1917); see Leroy v. Great Western United Corp., 443 U.S. 173, 181, esp. 182 n.13, 99 S.Ct. 2710, 2716, esp. 2716, n. 13, 61 L.Ed.2d 464 (1979). The only explicit expression of Congressional intent with regard to preemption of State securities statutes is set forth in the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a) (1970), which provides that nothing in that title "shall affect the jurisdiction of the securities commission . . . of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder." The federal statute itself thus explicitly recognizes the rights of the States to legislate in the field, and this same conclusion was acknowledged by the Supreme Court in Leroy v. Great Western United Corp., 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). There the Court concluded that § 78bb(a) "was plainly intended to protect, rather than to limit, state authority." Id. at 182, 99 S.Ct. at 2716.[9]
 
 
 24
 We have before us, then, not a case of an entire area which Congress has preempted, for Congress has explicitly said that it did not, but a case in which there is a part of the area in which Congress has not acted. Neither has the Securities and Exchange Commission acted in the entire area.[10] That being true, balancing the harm to the parties in accordance with Maryland Undercoating and Blackwelder, as we have above set forth, and not being reasonably certain that the plaintiff will ultimately prevail, we think that Maryland Undercoating and Blackwelder argue against the issuance of a temporary injunction in this case.
 
 
 25
 We also think the public interest is as well served by compliance with a valid State statute as it is by a free securities market. In this case, the public interest must be what has been declared either by Congress or by the State legislature or both. Since Congress has not acted in a part of the area, the public interest we think is served by adherence to the State statute unless and until it is declared invalid.
 
 
 26
 So far as burdening interstate commerce is concerned, nothing in this sparse record indicates any burden that is other than incidental, or that any burden which may have been imposed is clearly excessive. See Pike v. Bruce Church Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). We do not intimate that there may not be an impermissible burden on interstate commerce, as we do not intimate that there is. It is simply that the record shows none at this stage of the proceeding and the burden of proof is on the plaintiff to establish the burden if any there be.
 
 
 27
 On the whole case, because the district court laid undue and mistaken emphasis on the likelihood of success, mistook the emphasis in balancing the hardships, omitted consideration of the other American shareholders, found a conflict between the statutes where none may necessarily exist, and found an impermissible burden on interstate commerce on an insufficient record, we believe its preliminary injunction was improvidently issued.
 
 
 28
 The order of the district court appealed from is
 
 
 29
 VACATED.
 
 ORDER
 
 30
 In the petition for rehearing filed by Telvest, we were first advised of the amendment of § 13.1-529(b)(iii) of the Code of Virginia which was in issue in this case. The amendment was approved March 19, 1980 and was emergency legislation which became effective on that date.
 
 
 31
 Telvest now takes the position that the controversy is moot because of the amendment to the statute mentioned just above. The issue before us in this appeal was whether or not the district court abused its discretion, not, strictly speaking, the validity of the statute, and we simply vacated the temporary injunction issued by the district court, where this controversy remains. Having done no more than vacate the order of the district court appealed from, nothing in this decision should prevent the consideration of mootness in that court. See FRCP 12(h)(3).
 
 
 32
 It is accordingly ADJUDGED and ORDERED that the petition for rehearing shall be, and the same hereby is denied.
 
 
 33
 With the concurrences of BUTZNER, Circuit Judge, and THOMSEN, Senior District Judge.
 
 
 
 *
 United States District Court for the District of Maryland, sitting by designation
 
 
 [1]
 Va.Code Ann. §§ 13.1-528 to 13.1-541
 
 
 [2]
 Va.Code Ann. § 13.1-529(i)
 
 
 [3]
 Va.Code Ann. §§ 13.1-530 to 13.1-534
 
 
 [4]
 Generally those effected through a broker on an exchange or in the over-the-counter market with no solicitation and with customary compensation to the broker. Va.Code Ann. § 13.1-529(b)(iii)
 
 
 [5]
 Va.Code Ann. § 13.1-529(b)(iii) was amended to read:
 An offer to purchase shares to be effected by a registered broker-dealer on a stock exchange or in the over-the-counter market if the broker performs only the customary broker's function, and receives no more than the customary broker's commissions, and neither the principal nor the broker solicits or arranges for the solicitation of orders to sell shares of the offeree company, provided, however, that no more than one per centum of the outstanding shares of such class have been acquired by the offeror pursuant to this clause during the preceding six months; (1979 amendment italicized).
 
 
 [6]
 Va.Code Ann. § 13.1-529(b)(vi)
 
 
 [7]
 15 U.S.C. §§ 78m(d)-(e), 78n(d)-(f)
 
 
 [8]
 The Ohio take-over act, with a similar hearing provision, has recently been held to be constitutional, AMCA International Corp. v. Krouse, 482 F.Supp. 929 (S.D.Ohio 1979)
 
 
 [9]
 In most cases considering the constitutionality of State take-over bid statutes, the courts have had before them parties attempting to make formal tender offers where State tender offer procedures were in direct conflict with the affirmative provisions of the Williams Act. Mite Corp. v. Dixon, No. 79-C-200 (N.D.Ill. Feb. 9, 1979), appeal pending No. 79-1267 (7th Cir.); Brascan Ltd. v. Lassiter, No. 79-1253 (E.D.La. May 3, 1979); Dart Industries Inc. v. Conrad, 462 F.Supp. 1 (S.D.Ind.1978), all enjoining enforcement of State take-over statutes
 In Great Western United Corp. v. Kidwell, 577 F.2d 1256 (5th Cir. 1978) rev. on venue grounds sub nom. Leroy v. Great Western United Corp., 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), the court enjoined enforcement of the Idaho take-over bid statute on grounds that its fiduciary approach was incompatible with the market approach of the Williams Act while pointing out that the pre-offer publication requirements of the State act could be deemed publication within the meaning of the Williams Act so as to bring the time requirements for the two acts in conflict.
 But see AMCA International Corp. v. Krouse, 482 F.Supp. 929 (S.D.Ohio December 21, 1979), in which the Ohio take-over statute was held to be constitutional although provisions requiring disclosure and hearing prior to offer were not found in Williams Act. In City Investing Co. v. Simcox, 476 F.Supp. 112 (S.D.Ind.1979), the court abstained from ruling on matter because of pending State court proceeding but indicated that the Indiana take-over bid act was constitutional. And in UV Industries v. Posner, 466 F.Supp. 1251 (D.Me.1979), the district court issued a temporary injunction at the instance of the target corporation, requiring compliance by a prospective purchaser with Maine's take-over bid statute. The court did not consider the constitutional validity of the Maine statute because of the expedited and incomplete hearing, not dissimilar to that obtaining in the case at hand.
 
 
 [10]
 Since the commencement of this action, the SEC has filed proposed regulations in the Federal Register, 44 Fed.Reg. 70326 et seq. Because the substance of these regulations, which define tender offers and include regulations for the conduct of tender offers, are on the same subject matter as this case they have potential consequence here. In its synopsis to these regulations, the SEC concludes that these regulations issued under the Securities Exchange Act are in conflict with State take-over statutes even if the federal act itself is not in conflict. 44 Fed.Reg. 70328-70330. We, however, have not considered the effect of these proposed regulations upon this case because the regulations are not in effect and we do not know when, if ever, they will become effective. If they do become effective while this case is being considered in the district court, that court will doubtless take them into account