**CANADIAN PACIFIC ENTERPRISES (U.S.) INC. et al., Plaintiffs,**

v.

**Kenneth E. KROUSE, Commissioner of the Ohio Division of Securities, Defendant.**

**No. C-2-80-1056.**

United States District Court, S. D. Ohio, E. D.

Jan. 16, 1981.

John J. Chester, Chester, Saxbe, Hoffman & Willcox, Roderick H. Willcox, Donald A. Antrim, Smith & Schnacke, Columbus, Ohio, for plaintiffs.

William J. Brown, Atty. Gen. of Ohio, Roger P. Sugarman, Asst. Atty. Gen., trial counsel, Columbus, Ohio, for defendant Krouse.

John C. Elam, Vorys, Sater, Seymour & Pease, Columbus, Ohio (William H. Wallace and James T. Crowley, Thompson, Hine & Flory, Cleveland, Ohio, Morgan Shipman, Vorys, Sater, Seymour & Pease, Columbus, Ohio, of counsel), for defendant Hobart.

THE Securities and Exchange Commission, *amicus curiae*; Paul Gonson, Solicitor, James R. Farrand, Asst. Gen. Counsel, James J. Junewicz, Sp. Counsel, Securities and Exchange Commission, Washington, D.C., on brief.

1. These sections comprise the Williams Act, that part of the Exchange Act which deals with tender offers.

2. Rule 14d–2 provides in pertinent part:
   Date of commencement of a tender offer

## OPINION AND ORDER

KINNEARY, District Judge.

Plaintiffs Canadian Pacific Enterprises (U.S.) Inc. and its wholly owned subsidiary CPE Acquisition Co. [collectively referred to herein as CPE] brought this action pursuant to 28 U.S.C. Sections 1331(a), 1343(3), and 2201 for a declaratory judgment and injunctive relief. Plaintiffs assert that Ohio Revised Code Section 1707.041(B)(1)—the provision of the Ohio takeover statute that requires public announcement of a takeover bid at least twenty days before it is made—is unconstitutional because it conflicts with the Securities Exchange Act of 1934 [Exchange Act], 15 U.S.C. Sections 78m(d)–(e), 78n(d)–(f), as amended,[1] and regulations promulgated thereunder, 17 C.F.R. Sections 240.14d–1 *et seq.*, which forbid public announcement of a tender offer more than five business days before it is made.

The case was tried to the Court on December 29, 1980. Based upon the evidence adduced at trial, the pleadings, the trial memoranda of the parties, and other materials now before it, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

On December 15, 1980 CPE publicly announced a tender offer for all outstanding shares of common stock of Hobart Corporation [Hobart], an Ohio corporation with its principal place of business at Troy, Ohio and substantial assets in Ohio. The announcement specified an offering price of $32.50 per share. On that same date CPE filed its offering materials with the Securities and Exchange Commission [SEC, Commission] and the Ohio Division of Securities [Division].

Plaintiffs are subject to Rule 14d–2(b),[2]

(b) Public announcement. A public announcement by a bidder through a press release, newspaper advertisement or public statement which includes [(1) the identity of the bidder; (2) the identity of the subject company; and (3) the amount and class of securities being sought and the price or range of prices being offered therefor] with respect

which provides that when specified material terms of a cash tender offer are publicly announced the tender offer is deemed to have commenced for purposes of the Williams Act. Within five days of the date of public announcement the offeror must either file a Schedule 14D-1 with the SEC, distribute prescribed information to shareholders, and proceed with the offer in compliance with federal law, or publicly announce that it will not pursue the offer, in which event the offer will be deemed never to have begun. If the bidder elects to proceed, the offer will be deemed to have commenced on the date the filing and dissemination requirements are satisfied, rather than on the date of the earlier public announcement.

Plaintiffs are also subject to Ohio Revised Code Section 1707.041(B)(1), which prevents an offeror from making its offer until at least twenty days after public announcement of the terms.[3]

Having publicly announced the identities of bidder and target, the amount and class of securities sought, and the price, CPE was required by federal law to "commence" or withdraw its offer within five business days of the announcement. The Ohio twenty day rule, however, prohibited CPE from making its offer during the federally mandated period.

Confronted with the impossibility of simultaneous obedience to both federal and state law, plaintiffs brought this action on the same date that they announced and filed their tender offer, seeking temporary and permanent injunctive relief against enforcement of the twenty day provision of the Ohio Act. This Court permitted Hobart, the target, to intervene as a defendant, and granted Hobart's motion for a temporary restraining order against the tender offer as violative of the Ohio Act. Hobart and Commissioner Krouse answered, raising as a defense the invalidity of Rule 14d-2.

Plaintiffs then moved to dissolve the temporary restraining order. Immediately after hearing argument on December 17, 1980, the Court dissolved that order and entered a new order:

> In the interests of fairness and to preserve, so far as possible, the status quo pending decision on the merits, the Court hereby (1) SUSPENDS the operation and enforcement against plaintiffs in their bid to acquire Hobart Corporation of Ohio Revised Code Section 1707.041(B)(1) insofar as it requires that commencement of plaintiff's [sic] offer be delayed twenty days following initial public announcement; and (2) ORDERS that the offer remain open, that withdrawal rights remain in force, and that plaintiffs not

---

3. Section 1707.041(B)(1) states:

> to a tender offer in which the consideration consists solely of cash . . . shall be deemed to constitute the commencement of a tender offer . . . *except that* such tender offer shall not be deemed to be first published or sent or given to security holders by the bidder . . . on the date of such public announcement if within five business days of such public announcement, the bidder . . .
> (2) Complies with Rule 14d-3(a) [by filing with the SEC and distributing a Tender Offer Statement] and contemporaneously disseminates the disclosure required by Rule 14d-6 . . . to security holders pursuant to Rule 14d-4 . . . or otherwise in which event:
> (i) the date of commencement of such tender offer . . . will be determined by the date the information required by Rule 14d-6 is first published or sent or given to security holders pursuant to Rule 14d-4 or otherwise . . . .

> No offeror shall make a take-over bid unless at least twenty days prior thereto he announces publicly the terms of the proposed take-over bid and files with the division of securities and the target company copies of all information required by division (B)(3) of this section, and either:
> (a) Within ten days following such filing no hearing is ordered by the division or requested by the target company;
> (b) A hearing is requested by the target company within such time but the division finds that no cause for hearing exists;
> (c) A hearing is ordered within such time and upon such hearing the division adjudicates that the offeror proposes to make fair, full, and effective disclosure to offerees of all information material to a decision to accept or reject the offer.
> The Ohio Act does not apply to tender offers approved by target management. O.R.C. § 1707.041(A)(1)(d).

purchase tendered shares until 12:01 A.M., New York City Time, on the eighth day following the issuance of this Court's opinion and order on the merits or an adjudication by the Ohio Division pursuant to Ohio Revised Code Section 1707.-041(B)(4), whichever comes later.

In its order of December 17 the Court also identified as the primary issue of law whether Rule 14d–2(b) exceeds the rule-making authority of the SEC and set the case for expedited hearing on the merits.

The Court heard testimony from only one witness, Mr. Francis Wheat, who served as a Commissioner with the SEC from 1964 until 1969, the period when the Williams Act was considered and enacted by the Congress (tr. 51). He directed a study that culminated in a widely read document, "Disclosure to Investors, A Study of the Policies of the Securities and Exchange Commission," better known as the "Wheat Report" (tr. 52–53).

Mr. Wheat also served as an advisor to Professor Loss, the Reporter for the American Law Institute's comprehensive study of federal securities law. That study yielded draft legislation, the so-called "Loss Code," which includes a ten day advance announcement requirement that parallels the twenty day advance filing requirements of the takeover statutes of Ohio and other states, as well as a specific preemptive provision. (Tr. 64, 70, 101.)

In his testimony Mr. Wheat cited the SEC's formal endorsement of the Loss Code as evidence of the Commission's desire to impose preemption for preemption's sake:

> [S]ince the Loss Code contains a specific preemptive provision, the Commission obtains, by the adoption of that code, what it wants, which is the preemption of the state laws, and is no longer really concerned with whether or not there is an advanced filing requirement. It is concerned with the advanced filing requirement apparently only to obtain preemption.

(Tr. 101–02.) He further observed that he was unaware of any factual data adduced by the SEC to support either its five day rule or its assertion that state takeover statutes frustrate the operation and purposes of the Williams Act, and testified that the absence of studies reinforced his conclusion that the SEC sought preemption for its own sake (tr. 104–05, 120).

Counsel for amicus SEC elicited from Mr. Wheat the fact that defendants' exhibit G—the Commission's Statement Concerning Codification of the Federal Securities Laws, Release No. 33–6242—lacked certain documents that had been appended to it at the time it was released. These included a letter from Professor Loss explaining certain negotiations and agreements he had conducted with the SEC, and acknowledging that the SEC, despite its expressed support for the proposed Code, had reserved the right to bring before the Congress its own tender offer legislation at a time of its own choosing. The SEC has now submitted a broad legislative proposal concerning the regulation of large acquisitions of shares of major companies. That proposal, in contrast to the Loss Code, is silent with respect to pre-commencement public announcement of the terms of a tender offer. (Tr. 143–46.)

Mr. Wheat identified several effects of the five day rule which he finds undesirable. Some states, attempting to accommodate the new federal rule, have modified their own rules to make the advance filing confidential rather than public. The witness believes that because insiders might pierce the confidentiality, the strong public disclosure policy of the securities laws will be contravened. (Tr. 109–10.)

Rule 14d–2 does not apply to "paper tenders," tender offers in which the consideration is securities rather than cash, an exception which Mr. Wheat acknowledges to be required by federal securities statutes but apparently feels to be otherwise unjustified (id. 110–14). Mr. Wheat noted that the rule, as written, would not govern a tender offer that is ninety-five percent for cash and five percent for securities (id. 119).

Upon cross-examination Mr. Wheat conceded that Rule 14d–2 imposed no detriment upon Hobart shareholders, noting,

however, that hardship was avoided only through the offeror's voluntary expansion of withdrawal rights beyond federal requirements (*id.* 127).

There are few disputed facts implicated in this action. The parties agree that CPE's tender for Hobart is subject to the requirements of Rule 14d–2 and Ohio Revised Code Section 1707.041(B)(1), by virtue of Hobart's status as an Ohio corporation with principal executive offices and substantial assets in Ohio, registered pursuant to Section 12 of the Exchange Act and traded on the New York and Cincinnati Stock Exchanges. The Court thus concerns itself with the apparently irreconcilable conflict of state and federal law here presented.[4]

### Discussion

The question before the Court is whether Rule 14d–2(b) is valid and preempts an ostensibly conflicting state statute, Ohio Revised Code Section 1707.041(B)(1).[5] In deciding that question we shall begin by examining preemption, assuming *arguendo* the validity of the federal rule. We shall next determine if the federal rule is actually valid, inquiring, first, whether the SEC has exceeded the scope of rulemaking authority conferred upon it by the Congress and, second, whether the SEC acted arbitrarily or capriciously in promulgating this rule.

### Preemption

This Court set forth its approach to preemption analysis in *AMCA International Corporation v. Krouse*, 482 F.Supp. 929, 933–34 (S.D.Ohio 1979):

Did Congress intend to preclude Ohio from concurrent regulation of tender offers? If Congress did not intend preemption, are there nevertheless conflicts between the Williams Act and the Ohio Act that prevent realization of the legislative goals that Congress intended to achieve?

Our conclusion in *AMCA* that the Williams Act did not preempt the Ohio Act was premised upon two findings: that the Congress did not intend a sweeping general prohibition upon state regulation of tender offers; and that the Ohio Act did not in fact conflict with the then applicable federal law. The Court remains unshaken in its belief that states are not preempted from regulating in this subject area. But although we concluded that there was no conflict between federal and Ohio law at the time we decided *AMCA*, an apparent impasse has been created since Rule 14d–2(b) took effect.

This Court, taking judicial notice of the then impending Rule 14d–2(b), observed in *AMCA* that "the Ohio Act in its present form will indisputably be preempted when the new federal regulation becomes effective . . . ." 482 F.Supp. at 933–34 n. 4.[6] We based that observation upon the pronouncement of the Supreme Court in *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963) (citations deleted):

A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce . . . .[7]

---

**4.** The Division has not elected to construe the Ohio Act to harmonize ith the new federal rule.

**5.** The Court addresses only the conflict between the twenty day provision of the Ohio Act and the five day requirement of Rule 14d–2(b). The parties have not sought reexamination of the holding in *AMCA International Corporation v. Krouse*, 482 F.Supp. 929 (S.D.Ohio 1979) that the Ohio Act in its entirety is not preempted and does not violate the commerce clause; nor have plaintiffs challenged other possible conflicts between Ohio law and the federal reg-

ulations that took effect since *AMCA* was decided.

**6.** It is important to emphasize that the *validity* of Rule 14d–2(b) was not a consideration; then, as now, the Court assumed validity for the purpose of preemption analysis.

**7.** As the quoted language clearly states, the supremacy clause of the United States Constitution, art. 6, cl. 2, applies to validly promulgated federal regulations as well as federal statutes. *Accord, Free v. Bland*, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962).

The United States Court of Appeals for the Third Circuit has recently considered—albeit in a different procedural context—whether Rule 14d–2(b) preempts conflicting state provisions for pre-offer announcement. *Kennecott Corporation v. Smith*, 637 F.2d 181, (CA 3, 1980).[8] Considering facts virtually indistinguishable from those now before us, the court ruled in *Kennecott* that the district court had erred in denying preliminary injunctive relief to an offeror that had demonstrated a reasonable probability of eventual success on the merits: "Kennecott has shown that it pursued a course authorized under federal law, that this course conflicted with state law, and that it was not possible to comply with both schemes." *Id.*, at 187.[9]

The clash between the federal five day rule and Ohio's twenty day provision is now squarely before us. Discerning no change in either the practical circumstances or the legal principles, the Court adheres to its prediction in *AMCA* and concludes that the Ohio twenty day provision is preempted if Rule 14d–2(b) is valid.[10]

## Validity of the Federal Rule

We now address the principal issue before us: Whether Rule 14d–2 is valid. Because plaintiff in this action does not challenge federal rulemaking, and neither defendant is subject to the strictures of Rule 14d–2(b), the provisions of the Administrative Procedure Act, in particular 5 U.S.C. Section 706 (1977 ed. supp. 198)[11] have not been formal-

---

**8.** In *Kennecott* the court expressly presumed the validity of the Williams Act and regulations issued pursuant to it. Slip op. at 3 n. 1. In another very recent case, *Hi-Shear Industries, Inc. v. Campbell*, No. 80–2211–9 (D.S.C., Dec. 4, 1980), stay pending appeal denied, Nos. 80–1825, 80–1826 (CA 4, Dec. 8, 1980) it was found that the South Carolina tender offer statute was preempted by federal law. Although the action arose after promulgation of Rule 14d -2, *Hi-Shear* is concerned primarily with whether federal law precludes state review of substantive fairness, an issue not now before us. One court was able to avoid treating the direct conflict of federal and state law when state officials interpreted their own statute in a manner that allowed the two rules to be harmonized. *Sun Life Group, Inc. v. Standard Life Insurance Co. of Indiana*, Fed.Sec.L.Rep. (CCH) ⸀ 97,314 (S.D.Ind., Mar. 12, 1980). Many of the challenges to state tender offer statutes arose prior to promulgation of the new federal rules and thus offer little guidance to our deliberations. *E. g., Mite Corporation v. Dixon*, 633 F.2d 486, Fed.Sec.L.Rep. (CCH) ⸀ 97,660 (CA 7, 1980); *Great Western United Corporation v. Kidwell*, 557 F.2d 1256 (CA 5, 1978), *rev'd on grounds of improper venue sub. nom. Leroy v. Great Western United Corporation*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979).

**9.** The *Kennecott* court continued:

It has also demonstrated that the effect of the state law has been to prevent prompt disclosure of crucial information to the shareholders, and, through delay, to shift the advantage in this struggle to incumbent management. Both these effects appear to be inimical to the purposes of the federal law. A primary purpose of the Williams Act, as well as the regulations adopted under it is to ensure that full information is conveyed to the shareholders of a target company as soon as

possible, so that they may exercise a knowledgeable and an unfettered choice. The Act is also designed to preserve a balance between incumbent management and challenging groups so that neither has an undue advantage.

*Kennecott*, at 187–188.

This Court believes that once the Third Circuit had presumed the validity of the federal rule, it could have concluded that preemption was highly likely solely from a determination that simultaneous compliance was impossible, and need not have explored the congressional purpose.

**10.** *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973) is not to the contrary. The New York Stock Exchange arbitration rule in question was held not to preempt state law because that rule was not within the Exchange's mandate for investor protection. Moreover, § 6(c) of the Exchange Act, 15 U.S.C. § 78f(c), "explicitly subjects exchange rules to requirement of consistency with the Act 'and the applicable laws of the State in which [the exchange] is located.'" *Id.* at 137, 94 S.Ct. at 394.

**11.** 5 U.S.C. § 706 provides, in pertinent part:

The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

ly invoked. The Court nevertheless concludes that it should adopt the standards prescribed by Section 706 in determining whether defendants in this action prevail upon their affirmative defense that Rule 14d–2 is invalid because it exceeds agency authority and is arbitrary and capricious.[12]

*(a) Rulemaking Authority.* It is axiomatic that

> [t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is "the power to adopt regulations to carry into effect the will of Congress as expressed by the statute."

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213–14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976) (citation deleted). Plaintiffs and the SEC, as *amicus curiae,* urge that Rule 14d–2(b) furthers the purposes of the Exchange Act. Defendants, however, maintain that the rule transcends the scope of delegated regulatory authority and even conflicts with the Exchange Act itself.

■ We dispose first of the alleged conflict of the rule with Section 14(d)(1) of the Exchange Act, 15 U.S.C. Section 78n(d)(1), which makes it

> unlawful ... to make a tender offer ... unless at the time copies of the offer ... are first published or sent or given to security holders [the offeror] has filed with the Commission a statement containing [specified information].

Defendants argue that the SEC by contorted use of the "commencement" concept has impermissibly contrived to make the contested regulation include a time before an offer is "first published or sent or given to security holders." We disagree. That

argument was advanced by defendants in *Applied Digital Data Systems, Inc. v. Milgo Electronic Corporation,* 425 F.Supp. 1145 (S.D.N.Y.1977), but rejected by the court. The United States Court of Appeals for the Second Circuit recently cited *Milgo* and observed that

> statements made on the eve of a tender offer by target or tendering companies [are] not wholly outside the scope of the Williams Act. On the contrary, where the offer ultimately becomes effective, and reliance can be demonstrated or presumed, such statements may well be made "in connection with a tender offer" as required by § 14(e). Otherwise, either party would be free to disseminate misinformation up to the effective date of the tender offer, thus defeating in substantial part the very purpose of the Act—informed decisionmaking by shareholders.

*Lewis v. McGraw,* 619 F.2d 192, 195 (CA 2, 1980). This Court shares the perspective expressed in *Lewis.*

■ When it adopted Rule 14d–2, the SEC identified as its statutory authority, *inter alia,* Sections 3(b), 14(d), 14(e), and 23(a) of the Exchange Act. Securities Exchange Act Release No. 34–16384, 44 Fed. Reg. 70326 (Dec. 6, 1979). The Court shall examine these sections in turn, to determine whether, individually or collectively, they support the challenged rulemaking.

A general grant of authority for the challenged rule appears at Section 3(b), 15 U.S.C. Section 78c(b), which provides:

> The Commission ... shall have power by rules and regulations to define technical, trade, accounting, and other terms used in this chapter, consistently with the provisions and purposes of this chapter.

---

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party ....

**12.** Not least of these standards is the principle that administrative action is entitled to a presumption of regularity. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) and cases cited therein; *Ethyl Corporation v. Environmental Protection Agency,* 541 F.2d 1, 34 (D.C.Cir., 1976), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

Defendants argue that the SEC has exceeded the scope of its authority by defining "commencement"—a word that is not used in the Exchange Act. As the Court understands it, however, the SEC has employed the term "commencement" to define, summarize, and interpret the statutory phrase "first published or sent or given to security holders." That phrase embodies a key concept of the statute, for Section 14(d)(1) of the Act, 15 U.S.C. Section 78n(d)(1), makes it

> unlawful ... to make a tender offer ... unless at the time copies of the offer ... are first published or sent or given to security holders [the offeror] has filed with the Commission a statement containing [prescribed information].

The Court would have scant difficulty finding the phrase "first published or sent or given" a "technical" term the definition of which is fully consistent with the protective purposes of the Exchange Act. Our task is made lighter still by the 1975 amendment to the Exchange Act which broadened the Commission's definitional powers to include "other terms."

> Section 23(a) of the Exchange Act, 15 U.S.C. Section 78w(a)(1), gives the SEC power to make such rules and regulations as may be necessary or appropriate to implement the provisions of this title for which [it is] responsible or for the execution of the functions vested in [it] by this chapter ....

Defendants disclaim the applicability of this section. They assert, first, that the disputed rule is not necessary or appropriate to implement the provisions of the Exchange Act because it seeks impermissibly to preempt state law and to introduce a new term, "commencement," into the Act, and second, that the SEC has no "function" vested by the Act to justify promulgation of the rule. As has already been noted, preemption by rule of a particular aspect of a state takeover statute is not proscribed, and "commencement" constitutes a definition, not a new term itself defined. The "functions" of the SEC are not boundless, but they are nevertheless very broad in

service of investor protection and the public interest.

The breadth of rulemaking authority under a general provision such as Section 23(a) is considerable:

> Where the empowering provision of a statute states simply that the agency may "make ... such rules and regulations as may be necessary to carry out the provisions of this Act," we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is "reasonably related to the purposes of the enabling legislation."

*Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973) [footnote and citations deleted]. The United States Court of Appeals for the Second Circuit applied that standard in holding that Rule 23(a) authorized SEC rulemaking concerning the conduct of attorneys practicing before the Commission despite the lack of an express grant of authority for that purpose. *Touche Ross & Co. v. Securities and Exchange Commission*, 609 F.2d 570 (CA 2, 1979). Similarly, the exercise of regulatory authority now before this Court fits within the ample bounds of Rule 23(a).

The Williams Act provides additional bases for rulemaking that is directed toward tender offers. Section 14(d)(1) of the Exchange Act, 15 U.S.C. Section 78n(d)(1), empowers the SEC to adopt rules prescribing the contents of statements filed with the Commission and disseminated to shareholders and others. The Court agrees with defendants that Section 14(d)(1) does not authorize promulgation of Rule 14d–2. We believe, however, that Section 14(d)(4) is germane and contributes toward the requisite authority.

Section 14(d)(4) of the Exchange Act, 15 U.S.C. Section 78n(d)(4), gives the SEC plenary power to regulate the conduct of all who solicit acceptances or rejections of tender offers:

> Any solicitation or recommendation to the holders of [a subject] security to accept or reject a tender offer or request or invitation for tenders shall be made in

accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Defendants assert that the foregoing section applies only to an existing tender offer. In support of their construction they point to the legislative history:

Under this provision the Securities and Exchange Commission could specify the information to be included in any recommendation by management or others in favor of or in opposition to a tender offer and could regulate the solicitation of investors by brokers and dealers who are often compensated for shares tendered as a result of their activities. It would also enable the Securities and Exchange Commission to regulate the activities of persons who make competing tender offers or seek to influence the investor's decision on a tender offer.

H.Rep.No.90–1711, 90th Cong., 2d Sess. 10 (1968); 1968 U.S.Code Cong. & Admin. News, pp. 2811, 2820.

The Court does not read the legislative history so restrictively. Although the House Report instructs us that the SEC may regulate the activities that develop once a tender offer is under way, it does not suggest that the words "any solicitation ... to the holders ... to accept ... a tender offer" should be read narrowly. Indeed, to do so would contradict the plain meaning of the statutory text.

Section 14(e) of the Williams Act, 15 U.S.C. Section 78n(e), further contributes to the authority of the SEC to adopt the challenged rule. That section provides:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such

offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

Defendants, disingenuously claiming inability to identify any "fraudulent, deceptive, or manipulative" practices at which Rule 14d–2 might be directed, protest that the SEC has indicted the state tender offer statutes themselves. Defendants' interpretation is strained at best. The Court easily finds considerable potential for manipulation if an offer is publicly announced, but the shareholders are not afforded the protections of the Williams Act. The subject matter of Rule 14d–2 is, in the opinion of this Court, well within the scope of regulatory authority conferred by Section 14(e).

The Court is persuaded that the sections of the Exchange Act invoked by the SEC in support of Rule 14d–2, taken individually and collectively, abundantly authorize administrative regulations that prescribe the timing of announcement and filing relative to the actual making of a tender offer. Having so concluded, we must decide whether the SEC nevertheless acted arbitrarily or capriciously in promulgating precisely this rule.

*(b) Arbitrariness or Capriciousness.* Our inquiry whether the SEC acted arbitrarily or capriciously, or abused its discretion, is shaped by the Supreme Court, which instructs us that

[u]nder the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment .... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe,* [401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)]. The

agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 [83 S.Ct. 239, 245, 9 L.Ed.2d 207] (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595 [65 S.Ct. 829, 836, 89 L.Ed. 1206] (1945).

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974).

This Court will therefore proceed to address the following issues: (1) What factors are relevant to the challenged rulemaking? (2) Did the SEC consider these factors? (3) Did the SEC expressly and rationally relate the factors to the rule it promulgated? [13]

■ The factors relevant to actions of the SEC under the Williams Act necessarily go to shareholder protection, for "the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 57 L.Ed.2d 124 (1977). Generally, this Court considers factors to be relevant if they tend to influence the behavior of investors themselves, of the original offeror and competing offerors of the target company, and of independent actors in the securities market, including arbitrageurs. The Court believes that the SEC duly considered the relevant factors throughout its lengthy rulemaking exercise.

The challenged rulemaking had its genesis in 1974, when the SEC conducted hearings into the subject of tender offer regulation, taking testimony and comments from interested persons. Securities Exchange Act Releases No. 5529, 39 Fed.Reg. 33935 (Sept. 9, 1974), and No. 5538, 39 Fed.Reg. 41223 (Nov. 5, 1974). The SEC issued proposed tender offer rules in 1976. Securities Exchange Act Release No. 34–12676, 41 Fed.Reg. 33004 (Aug. 6, 1976). The proposal drew further comment, collected at Public File No. S7–649.

Many months later, in February, 1979, the SEC withdrew its 1976 proposal and presented a revised proposal for public consideration. Securities Exchange Act Release No. 15548, 44 Fed.Reg. 9956 (Feb. 5, 1979) [February Release]. Having received comment, the SEC toward the end of 1979 adopted the rules it had proposed earlier that year, with certain revisions. Securities Exchange Act Release No. 34–16384, 44 Fed.Reg. 70326 (Dec. 6, 1979) [November Release]. The rules took effect on January 7, 1980.

With respect to present Rule 14d–2(b), the SEC demonstrated that it had considered relevant factors by including in its February, 1979 Release the following statement:

While revised Rule 14d–6(a) [renumbered and adopted as Rule 14d–2(b)] mainly represents a codification of present administrative practice, proposed Rule 14d–6(b) would prevent a potential abuse prevalent in current tender offer practice. It has become a common practice for a bidder to publicly announce the material terms of a cash tender offer in advance of the offer's formal commencement. Such announcements trigger market mechanisms, such as arbitrageur activity, which are normally attendant to the tender offer itself. This practice has become a matter of increasing concern because it causes investors to make investment decisions with respect to a tender offer on the basis of incomplete

---

**13.** The language of *Overton Park* further directs the reviewing court to consider "whether there has been a clear error of judgment." This Court is satisfied that the Supreme Court did not intend its words to establish a more intrusive review than had been conducted traditionally under the "arbitrary and capricious" standard. *See, e. g., Ethyl Corporation v. Environmental Protection Agency*, 541 F.2d 1, 34–35 n. 74 (CADC, 1976), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), and cases cited therein.

information. The Commission believes that this is the type of situation which the Williams Act was designed to prevent.[86]

[86] As stated in the Senate and House Reports accompanying the Williams Act: Without knowledge of who the bidder is and what he plans to do, the shareholder cannot reach an informed decision. He is forced to take a chance. For no matter what he does, he does it without adequate information to enable him to decide rationally what is the best possible course of action. This is precisely the kind of dilemma which our security laws are designed to prevent. 1967 Senate Report at 2; 1968 House Report at 3.

We emphasize that "consideration" of the relevant factors does not require identification and analysis of all possible factors; nor does it require reconciliation of the divergent views of public commenters, or even a majoritarian compromise. As we shall next discuss, the SEC, having reflected upon the significant objectives and factual circumstances[14] that underlie and constrain its rulemaking, must rationally relate them to the rule it has chosen.

In the Release that announced adoption of the new rules, the SEC alluded to

the need to ensure a balance between the interests of the person making a tender offer and the management of the company whose securities are being sought while providing disclosure and substantive protections to shareholders making investment decisions.

November Release at 70326. Later in that same Release appears this statement:

While recognizing its long and beneficial partnership with the states in the regulation of securities transactions, the Commission nevertheless believes that the state takeover statutes presently in effect frustrate the operation and purposes of the Williams Act[16] and that, based upon

the abuses in current tender offer practice discussed above, Rule 14d–2(b) is necessary for the protection of investors and to achieve the purposes of the Williams Act.

[16] See brief for SEC as Amicus Curiae *Leroy v. Great Western United Corp.*, [443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979)].

*Id.* at 70330.

The Court reads the November Release to incorporate by reference the *amicus* brief cited at footnote 16, which argues eloquently for a rule displacing state pre-commencement filing and waiting procedures.[15] Taken together with the discussion contained in the February Release, the *Leroy* brief is persuasive evidence that the SEC articulated a rational basis for Rule 14d–2 at the time of promulgation, not merely *post hoc,* as defendants would have it.

Chief among the SEC's reasons for promulgating the five day rule are restoration of neutrality between offerors and target management and stabilization of the function of secondary securities markets. With respect to the first reason, the SEC believes that the delay mandated by state statutes such as Ohio's may deter potential bidders by increasing their borrowing costs and introducing greater uncertainty into the complex dynamic process. *See* Brief for the SEC as Amicus Curiae at 57–58, *Leroy v. Great Western United Corporation,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). The SEC joins with many academic commentators in concluding that state-imposed delays are successfully crafted to give aid and comfort to target management. *Id.* at 14, 24–25 & n. 21. The SEC reasons essentially thus: The Congress adopted the Williams Act to protect investors by keeping a neutral balance between offerors and target management; the state pre-com-

**14.** Defendants protest that the SEC has cited no factual studies to support its rule (tr. 103–05). The Court, however, does not believe that either the Exchange Act or the Administrative Procedure Act requires the Commission to invoke particular data in its rulemaking. The Court credits the SEC—the administrative agency designated by the Congress to receive filings in all tender offers governed by the Williams Act—with broad factual knowledge of the subject.

**15.** Similar arguments were made to this Court in *AMCA.* We see no contradiction between our rejection of those arguments as inadequate to sustain the heavy burden of proving that the entire Ohio Act unconstitutionally burdened interstate commerce or was preempted by federal law *as it then existed,* and our acceptance of them when proffered as a rational basis for *new* federal law in the form of an administrative regulation.

mencement disclosure requirements clearly favor target management and probably discourage offerors; Rule 14d–2(b) eliminates that favoritism and restores the balance. *Id.* at 14.

In its *Leroy* brief the SEC carefully explained how pre-commencement filing (and other regulatory delays not challenged in this action) may disrupt securities trading:

> This uncertainty and delay increased the likelihood of irregular price and volume fluctuations in the securities of both the bidder and the target company. [Citing testimony of Donald Calvin, Vice President of the New York Stock Exchange, opposing adoption of the Ohio Act because the twenty day delay could provoke price fluctuations severe enough to require cessation of trading.]

> The burden ... on the proper functioning of the national securities markets is especially evident with respect to arbitrageurs, the professional traders who often decide the outcome of a tender offer by their decisions to buy target company securities and their disposition of the acquired shares. Arbitrageurs are important to the bidder because they tender a substantial portion of the shares in most tender offers. At the same time arbitrageurs provide a market for those shareholders of the target company who desire to sell their shares in the market prior to the termination of the tender offer. The most important functions of arbitrageurs can be severely hindered by the pre-commencement provisions of the Idaho statute, which dramatically increase the period during which the arbitrageurs' funds are at risk. The arbitrageur begins buying when the tender offer is first announced and assumes a significant economic risk until the shares tendered by the arbitrageurs are actually accepted by the offeror. Under the Williams Act, the arbitrageur is at risk only between the commencement and termination of the offer, which is generally defined in advance by the offeror. Under the Idaho statute [which closely resembles the Ohio Act], the risk-taking for the arbitrageur begins prior to the commencement of the offer and may include an indefinite period of delay—complicated by great uncertainty about whether an offer will ever be made. Thus, by artifically [sic] magnifying the economic risks of arbitrageurs, the focal points of trading activity during the tender offers, the Idaho statute substantially distorts the free interplay of buying and selling interests in the national markets for the securities of bidders and target companies....

*Id.* at 34–36 [citations deleted].

The Court finds nothing in the record before it to indicate that the foregoing assertions of the SEC are without rational foundation. Defendants in their arguments and through Mr. Wheat attack Rule 14d–2(b) as underinclusive and deliberately preemptive. The SEC, however, has discretion to regulate incompletely and to adopt a rational preemptive rule. The Court is without power to substitute its judgment for that of the SEC. *See Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1975) and cases cited therein.

It is the opinion of this Court that the SEC timely articulated a rational relationship of the relevant factors to the disputed rule. Whether the goal of investor protection could be further advanced by a different accommodation between the interests of offerors and target management is not our proper concern.

We find that the SEC adopted its preemptive rule with deliberate and rationally justifiable purpose to accomplish a permissible regulatory objective.[16] Even if the

---

16. Defendants argue that *American Optometric Association v. Federal Trade Commission*, 626 F.2d 896 (CADC, 1980), and *Katharine Gibbs School (Incorporated) v. Federal Trade Commission*, 612 F.2d 658 (CA 2, 1980), "make it clear that where an administrative agency arrogates to itself a wholesale power to preempt, the courts look at those regulations through vastly different glasses than those with which they view the sort of regulation addressed in *Free v. Bland* [369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962)]." (Tr. 192.) The Court does not view Rule 14d–2(b) as wholesale preemption of state law; the court characterized

Commission's motivation included an ignoble craving for preemption for its own sake—and the Court is not persuaded accordingly [17]—its adoption of Rule 14d–2(b) was not arbitrary, capricious, or an abuse of discretion under the standards set forth by the Supreme Court in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

## Conclusions of Law

The Court has jurisdiction of this matter pursuant to 28 U.S.C. Section 1331(a), 1343(3), and 2201.

██ Rule 14d–2(b), 17 C.F.R. Section 240.14d–2(b), promulgated by the Securities and Exchange Commission, is a valid rule that preempts the provision of Ohio Revised Code Section 1707.041(B)(1) that requires public announcement of a proposed takeover bid at least twenty days before it is made.

WHEREUPON, IT IS HEREBY ORDERED THAT the Clerk shall enter final judgment in favor of plaintiffs, declaring the foregoing provision of Ohio law preempted and enjoining its enforcement against them.

the Federal Trade Commission rule in *American Optometric Association* as "almost as thorough as human ingenuity could make it," 626 F.2d at 910, and the preemption provision in *Katharine Gibbs* implicated "an indefinite variety of state laws and regulations governing the contractual relations between vocational schools and their students," 612 F.2d at 667. Additionally, both cases came under the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub.L. No. 93–637, 88 Stat. 2183, which imposes special rulemaking

procedures, 15 U.S.C. § 57(a), that are somewhat contradictory, *American Optometric Association*, 626 F.2d at 904–06, and in any event do not govern this action.

17. The Commission's endorsement of the Loss Code was conditional (tr. 144–45); in any event an administrative agency, like the Congress itself, must be permitted to reconsider its policies and positions in light of changing circumstances.