The **BENDIX CORPORATION**

v.

**MARTIN MARIETTA CORPORATION,** etc., et al.

Civ. No. Y–82–2504.

United States District Court, D. Maryland.

Sept. 3, 1982.

---

John H. Lewin, Jr., Baltimore, Md., and Marc P. Cherno, New York City, for plaintiff.

George Beall, James R. Eyler, and Mark D. Gately, Baltimore, Md., for defendant Martin Marietta Corp.

Susan Gauvey, Asst. Atty. Gen., State of Md., Baltimore, Md., for defendant State of Md.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

Bendix brought this declaratory judgment suit asking this Court to declare the Maryland Corporate Take-Over Law, Md. Corp. & Ass'ns Code Ann.Code §§ 11–901–11–908 ("Maryland Law"), unconstitutional on the grounds that it violates the Commerce and Supremacy Clauses of the United States Constitution. On August 25, 1982 after a hearing in chambers, this Court issued a temporary restraining order against enforcement of the Maryland Law, and plaintiff now seeks a ruling on its application for a preliminary injunction.

*The Maryland Law.*

Enacted in 1976, the Maryland Law defines a "take-over offer," with certain exceptions, as an offer to "acquire or the acquisition of any equity security of a target company, pursuant to a tender offer" in which the "offeror would be directly or indirectly a beneficial owner of more than five percent of any class of the outstanding equity securities" of the target company. § 11–901(h)(1). A take-over offer is not subject to the Maryland Law unless the target company is a Maryland corporation and is doing business in Maryland, § 11–901(i), and 35 or more of the target company's shareholders reside in Maryland. § 11–901(h)(2)(iv). A take-over offer which is approved by the board of directors of the target company is also not subject to the Maryland Law. § 11–901(h)(2)(v).

Under the Maryland Law, an offeror must file a statement with the Maryland Securities Commissioner ("Commissioner") disclosing the same information which is required to be disclosed under the federal

securities laws. *Cf.* § 11–902(b) with 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f) ("Williams Act"). However, unlike the Williams Act which does not require that a disclosure statement be filed until the date the tender offer is first published, 15 U.S.C. § 78n(d)(1), the Maryland Law requires the filing of a disclosure statement at least 20 days prior to the date the tender offer is first published. § 11–902(a).

The Maryland Law contains anti-fraud provisions as well as other provisions governing the manner in which shares are tendered pursuant to a tender offer. §§ 11–904, 11–905(a)–(d).

Under the Maryland Law, the Commissioner can convene a hearing within 20 days of the filing of a disclosure statement to determine whether a tender offer complies with the Maryland Law. § 11–905(e)(2). In addition, upon request of a target company, "made within 10 days of the filing of a disclosure statement, "if in the opinion of the Commissioner good cause is shown, the Commissioner shall institute an investigation" to determine whether the tender offer complies with the Maryland Law. § 11–906. An offeror is prohibited from making a tender offer or acquiring any shares of a target company pursuant to a tender offer while a hearing or investigation is pending. § 11–905(e)(1). Therefore, since there are no time limits on an investigation and the Commissioner can indefinitely extend a determination following a hearing "for the convenience of the parties or for the protection of offerees [*i.e.* shareholders of the target company] in this State," an offeror can be required to wait an indefinite period before it may proceed with its tender offer. §§ 11–905(e)(2), 11–906.

In recognition of a possible conflict with Securities and Exchange Commission ("SEC") rules, the Maryland Law was amended in 1980. The amendment states that "the Commissioner, by rule or order, may modify, suspend, or exempt transactions from particular provisions" of the Maryland Law "to the extent the Commissioner deems such action necessary or appropriate to make their applications reason-ably consistent with the Securities Exchange Act of 1934." § 11–902(d).

Acting on the authority given to him by the amendment, the Commissioner promulgated Guidelines modifying the disclosure requirements in the Maryland Law. By way of preface to the Guidelines, the Commissioner stated that it is the policy of the Maryland Securities Division "to enter an order on a case by case basis as may be necessary to implement the take-over law so as not to be in conflict with the new federal rules. While the particular facts of each case may require individual review as to the proper order to be entered, the Division intends, in all appropriate instances, to implement this policy by entry of an order incorporating the provisions contained in the ... Guidelines." 1A Blue Sky L.Rep. (CCH) ¶ 30,563 (April 18, 1980). The Guidelines state that the disclosure statement filed at least 20 days prior to the date a tender offer is first published need contain only the name and address of the offeror, the name of the target company and a statement that the offeror intends to make a tender offer.

Courts are authorized to enjoin violations of the Maryland Law, § 11–906, and violations are subject to criminal penalties. § 11–705.

Bendix argues that the recent Supreme Court decision in *Edgar v. Mite Corp.,* — U.S. ——, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), striking down the Illinois Business Takeover Act compels the conclusion that the Maryland Law is also unconstitutional. In light of *Edgar* and other federal court decisions invalidating state takeover laws, Bendix argues that: 1) the Maryland Law is violative of the Commerce Clause in that it directly regulates interstate commerce; 2) the Maryland Law is violative of the Commerce Clause in that under the test of *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), the Maryland Law imposes burdens on interstate commerce that are excessive in relation to the putative local benefits; and 3) the Maryland Law is violative of the Supremacy Clause because several provisions

of the Maryland Law stand as obstacles to the accomplishment and execution of the full purposes and objectives of the Williams Act. Specifically, Bendix points to: (a) the requirement that the disclosure statement be filed 20 days in advance of the tender offer, (b) the provisions authorizing the Commissioner to institute a hearing or investigation of unlimited duration, (c) the provision allowing the board of directors of a target company to exempt the tender offer from the Maryland Law, and (d) the provision giving the target company (and others) the right to sue for an injunction, as in conflict with the Williams Act.

Defendants argue that *Edgar* is distinguishable because, unlike the Illinois Act at issue in *Edgar,* the Maryland Law neither violates the Commerce Clause nor the Supremacy Clause. Defendants place considerable reliance on the 1980 amendment to the Maryland Law which, as noted above, gives the Commissioner sweeping powers to alter or modify the Maryland Law. Indeed, the defendants argue that because of the sweeping powers given to the Commissioner, the precise contours of the Maryland Law are unsettled and this Court should accordingly abstain from ruling on its constitutionality.

*Preliminary Injunction Standard.*

This Court addressed the standard to be applied "in determining whether or not to issue a preliminary injunction under Rule 65(a)" in *Love v. Hidalgo,* 508 F.Supp. 177, 182–83 (D.Md.1981). In that case the Court said that the correct standard to be applied in the Fourth Circuit . . .

> was set forth in *Sinclair Refining Co. v. Midland Oil Co.,* 55 F.2d 42 (4th Cir. 1932):
>
> > "It is sufficient [to grant the motion] if the court is satisfied that there is a probable right and a probable danger, and that the right may be defeated, unless the injunction is issued, and considerable weight is given to the need of the protection to the plaintiff as contrasted with the probable injury to the defendant." 55 F.2d at 45.

That standard, which requires application of the balance-of-hardship test, has continually been reaffirmed by the Fourth Circuit as the proper trial court standard for interlocutory injunctive relief. *Blackwelder Furniture Co. v. Seilig Manufacturing Co., Inc.,* 550 F.2d 189 (4th Cir. 1977); *West Virginia Highlands Conservancy v. Island Creek Coal Co.,* 441 F.2d 232 (4th Cir. 1971). In *Blackwelder,* the Court held that a trial court could properly consider the following four general factors in considering whether or not to issue a preliminary injunction:

1. Likelihood of success on the merits;
2. Irreparable harm to be suffered by plaintiff without injunctive relief;
3. Harm to other interested persons if the injunction is issued; and,
4. The public interest.

550 F.2d at 196. However, that Court cautioned that in applying such a test, the court should give those four factors the relative emphasis required by the *Sinclair* rule:

> "The two more important factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a decree. If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success. Always, of course, the public interest should be considered." 550 F.2d at 196.

*Edgar v. MITE Corp.*

As in this case, *Edgar* dealt with a constitutional challenge to a state takeover law. Also, as in this case, the plaintiff argued that the state law was constitutionally defective on three grounds: 1) direct restraint on interstate commerce in violation of the Commerce Clause; 2) indirect restraint on interstate commerce where the burdens on interstate commerce are excessive in relation to the putative local benefits in violation of the Commerce Clause; and 3) conflict with the goals and purposes of the Williams Act in violation of the Supremacy Clause.

*Edgar* is not exactly a model of judicial unanimity, in as much as there are six opinions and seven different viewpoints. The only pair of Justices who completely agreed with each other were: 1) Justice White and Chief Justice Burger and 2) Justices Brennan and Marshall. Because Justices Brennan, Marshall and Rehnquist dissented on mootness grounds, only six Justices addressed the constitutional arguments.

Of the six Justices who discussed the merits of the case, five held that the Illinois Act at issue in the case was unconstitutional under the test in *Pike*—i.e. that the Illinois Act imposed undue burdens on interstate commerce in relation to its putative local benefits in violation of the Commerce Clause. Justice Blackmun did not address this point. Since this is the only clear holding in the case, the Court's language is of particular importance:

The Illinois Act is also unconstitutional under the test of *Pike v. Bruce Church, Inc.*, 397 U.S. at 142 [90 S.Ct. at 847], for even when a state statute regulates interstate commerce indirectly, the burden imposed on that commerce must not be excessive in relation to the local interests served by the statute. The most obvious burden the Illinois Act imposes on interstate commerce arises from the statute's previously described nationwide reach which purports to give Illinois the power to determine whether a tender offer may proceed anywhere.

The effects of allowing the Illinois Secretary of State to block a nationwide tender offer are substantial. Shareholders are deprived of the opportunity to sell their shares at a premium. The reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition, is hindered. The incentive the tender offer mechanism provides incumbent management to perform well so that stock prices remain high is reduced...

Appellant claims the Illinois Act furthers two legitimate local interests. He argues that Illinois seeks to protect resident security holders and that the Act

merely regulates the internal affairs of companies incorporated under Illinois law. We agree with the Court of Appeals that these asserted interests are insufficient to outweigh the burdens Illinois imposes on interstate commerce.

While protecting local investors is plainly a legitimate state objective, the state has no legitimate interest in protecting non-resident shareholders. Insofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law....

We are also unconvinced that the Illinois Act substantially enhances the shareholder's position. The Illinois Act seeks to protect shareholders of a company subject to a tender offer by requiring disclosures regarding the offer, assuring that shareholders have adequate time to decide whether to tender their shares, and according shareholders withdrawal, proration and equal consideration rights. However, the Williams Act provides these same substantive protections, compare Ill. Rev.Stat. ch. 121½, §§ 137.59. C, D, and E (Supp.1980) (withdrawal, proration, and equal consideration rights) with 15 U.S.C. § 78n(D)(5), (6) and (7) and 17 CFR § 240.14d–7 (1981) (same). As the Court of Appeals noted, the disclosures required by the Williams Act and the regulations pursuant to it may not substantially enhance the shareholders' ability to make informed decisions. 633 F.2d at 500. It also was of the view that the possible benefits of the potential delays required by the Act may be outweighed by the increased risk that the tender offer will fail due to defensive tactics employed by incumbent management. We are unprepared to disagree with the Court of Appeals in these respects, and conclude that the protections the Illinois Act affords resident security holders are, for the most part, speculative.

Appellant also contends that Illinois has an interest in regulating the internal affairs of a corporation incorporated under its laws. The internal affairs doc-

trine is a conflict of laws principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands. *See Restatement (Second) of Conflict of Laws,* § 302, Comment b at 307–308 (1971). That doctrine is of little use to the state in this context. Tender offers contemplate transfer of stock by stockholders to a third party and do not themselves implicate the internal affairs of the target company. . . .

—— U.S. at ——, 102 S.Ct. at 2641–2643.

Four Justices found the Illinois Act to be a direct restraint on interstate commerce and therefore violative of the Commerce Clause. Justices Blackmun and Powell did not address this point. The four Justices first distinguished blue sky laws (whose constitutionality has been repeatedly upheld) because blue sky laws apply to dispositions of securities within a single state. The Justices went on to say:

The Illinois Act differs substantially from state blue-sky laws in that it directly regulates transactions which take place across state lines, even if wholly outside the State of Illinois. A tender offer for securities of a publicly-held corporation is ordinarily communicated by the use of the mails or other means of interstate commerce to shareholders across the country and abroad. Securities are tendered and transactions closed by similar means. . . .

It is therefore apparent that the Illinois statute is a direct restraint on interstate commerce and that it has a sweeping extraterritorial effect. Furthermore, if Illinois may impose such regulations, so may other states; and interstate commerce in securities transactions generated by tender offers would be thoroughly stifled. In *Shafer v. Farmers Grain Co.,* 268 U.S. [189] at 199 [45 S.Ct. 481 at 485, 69 L.Ed. 909], the Court held that "a state statute which by its necessary operation directly interferes with or burdens . . .

[interstate] commerce is a prohibited regulation and invalid, regardless of the purposes with which it was enacted."

The limits on a state's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, "any attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power." *Shaffer v. Heitner,* 433 U.S. 186, 197 [97 S.Ct. 2569, 2576, 53 L.Ed.2d 683] (1977).

Because the Illinois Act purports to regulate directly and to interdict interstate commerce, including commerce wholly outside the state, it must be held invalid as were the laws at issue in *Shaffer. . .*

—— U.S. at ——–——, 102 S.Ct. at 2641.

Lastly, three Justices believed that the Illinois Act conflicted with the goals and purposes of the Williams Act and was therefore violative of the Supremacy Clause. Justice O'Connor did not address this point and Justices Powell and Stevens, in refusing to join the three other Justices on this point, made brief comments implying that state takeover laws are not preempted by the Williams Act.

The three Justices (Chief Justice Burger and Justices White and Blackmun) who favored preemption first noted that Congress had not explicitly prohibited states from regulating tender offers (*see* 15 U.S.C. § 78bb(a)) nor did the Illinois Act conflict with the Williams Act in such a manner as to make it impossible to comply with both. —— U.S. at ——, 102 S.Ct. at 2634. Thus, the preemption question turned on whether "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Williams Act. *Id.* citing *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). The three Justices discussed the Williams Act at some length:

The Williams Act, passed in 1968, was the congressional response to the increased use of cash tender offers in cor-

porate acquisitions, a device that had "removed a substantial number of corporate control contests from the reach of existing disclosure requirements of the federal securities laws." *Piper v. Chris-Craft Industries,* 430 U.S. 1, 22 [97 S.Ct. 926, 939, 51 L.Ed.2d 124] (1977). The Williams Act filled this regulatory gap. The Act imposes several requirements. First, it requires that upon the commencement of the tender offer, the offeror file with the SEC, publish or send to the shareholders of the target company, and furnish to the target company detailed information about the offer. 15 U.S.C. § 78(n)(d)(1), 17 CFR § 240.24d–3 (1981)... Second, stockholders who tender their shares may withdraw them during the first seven days of a tender offer and if the offeror has not yet purchased their shares, at any time after sixty days from the commencement of the offer. 15 U.S.C. § 78n(d)(5). Third, all shares tendered must be purchased for the same price; if an offering price is increased, those who have already tendered receive the benefit of the increase. 15 U.S.C. § 78n(d)(7).

There is no question that in imposing these requirements, Congress intended to protect investors. *Piper v. Chris-Craft Industries, supra* [430 U.S.] at 35 [97 S.Ct. at 946]; *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58 [95 S.Ct. 2069, 2075–2076, 45 L.Ed.2d 12] (1975); S.Rep.No.550, 90th Cong., 1st Sess. 3–4 (1967) ("Senate Report"). But it is also crystal clear that a major aspect of the effort to protect the investor was to avoid favoring either management or the takeover bidder... Congress became convinced "that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management." Senate Report at 3... As Senator Williams explained, "We have taken extreme care to avoid tipping the scales in favor of management or in favor of the persons making the takeover bids." 113 Cong.Rec. 24664 (1967)... We, therefore, agree with the Court of Appeals that Congress sought to protect the investor not only by furnishing him with the necessary information but also by withholding from management or the bidder any undue advantage that could frustrate the exercise of an informed choice. *Mite Corp. v. Dixon,* 633 F.2d 486 at 496 (7th Cir.).

—— U.S. at ——, 102 S.Ct. at 2635–2637.

The three Justices then went on to say that three specific provisions of the Illinois Act conflict with the goals and purposes of the Williams Act. Two of these provisions are also contained in the Maryland Law. The first provision required the offeror to file a disclosure statement 20 days before commencing a tender offer. The three Justices stated:

> The Illinois Act requires a tender offeror to notify the Secretary of State and the target company of its intent to make a tender offer and the material terms of the offer 20 business days before the offer becomes effective... The contrast with the Williams Act is apparent. Under that Act, there is no pre-commencement notification requirement; the critical date is the date a tender offer is "first published or sent or given to security holders." 15 U.S.C. § 78n(d)(x). See also 17 CRF § 240.14d–2 (1981).
>
> We agree with the Court of Appeals that by providing the target company with additional time within which to take steps to combat the offer, the pre-commencement notification provisions furnish incumbent management with a powerful tool to combat tender offers, perhaps to the detriment of the stockholders who will not have an offer before them during this period. These consequences are precisely what Congress determined should be avoided, and for this reason, the pre-commencement notification provision frustrates the objectives of the Williams Act.
>
> It is important to note in this respect that in the course of events leading to the adoption of the Williams Act, Congress several times refused to impose a pre-commencement disclosure requirement....

—— U.S. at ——, 102 S.Ct. at 2637.

The second provision that the three Justices found in conflict with the Williams

Act was the provision for a hearing to determine whether a tender offer complied with the Illinois Act. On this issue they said:

The hearing provisions of the Illinois Act frustrate the congressional purpose by introducing extended delay into the tender offer process. The Illinois Act allows the Secretary of State to call a hearing with respect to any tender offer subject to the Act, and the offer may not proceed until the hearing is completed. Ill.Rev.Stat., ch. 121½, §§ 137.57. A and B (Supp. 1980). The Secretary may call a hearing at any time prior to the commencement of the offer, and there is no deadline for the completion of the hearing. *Id.* at §§ 137.56 C and D. Although the Secretary is to render a decision within 15 days after the conclusion of the hearing, that period may be extended without limitations... As the Court of Appeals observed, these provisions potentially afford management a "powerful weapon to stymie indefinitely a takeover." 633 F.2d at 494. In enacting the Williams Act, Congress itself "recognized that delay can seriously impede a tender offer" and sought to avoid it. *Great Western United Corp. v. Kidwell,* 577 F.2d 1256, 1277 (CA5 1978); Senate Report at 4...

As we have said, Congress anticipated investors and the takeover offeror be free to go forward without unreasonable delay. The potential for delay provided by the hearing provisions upset the balance struck by Congress by favoring management at the expense of stockholders. We therefore agree with the Court of Appeals that these hearing provisions conflict with the Williams Act.

—— U.S. at ——, 102 S.Ct. at 2638–2639.

As noted above, Justices Stevens and Powell refused to join the above discussion on preemption. Justice Stevens wrote that "I am not persuaded, however, that Congress' decision to follow a policy of neutrality in its own legislation is tantamount to a federal prohibition against state legislation designed to provide special protection for incumbent management." —— U.S. at ——, 102 S.Ct. at 2648. Justice Powell stated that "I agree with Justice Stevens that the Williams Act's neutrality policy does not necessarily imply a congressional intent to prohibit state legislation designed to assure—at least in some circumstances—greater protection to interests that include but often are broader than those of incumbent management." —— U.S. at ——, 102 S.Ct. at 2643.

*Lower Federal Courts.*

Although *Edgar* is dispositive of this case, it is helpful to consider all of the Circuit Courts of Appeals opinions addressing the constitutionality of state takeover statutes. It should be kept in mind that there are now a great many district court opinions (most of which are unpublished) that have addressed issues similar or identical to those presented in this case (almost all of which have found the state statutes unconstitutional or probably unconstitutional). *See, e.g., Gunter v. AGO International B. V.,* 533 F.Supp. 86 (N.D.Fla.1981) (striking down Florida law); *Natomas Co. v. Bryan,* 512 F.Supp. 191 (D.Nev.1981) (striking down Nevada law); *Seagram & Sons Inc. v. Marley,* Fed.Sec.L.Rep. ¶ 98,246 (W.D.Okl.1981) (striking down Oklahoma law); *Crane Co. v. Lam,* 509 F.Supp. 782 (E.D.Pa.1981) (striking down Pennsylvania law); *AMCA International Corp. v. Krouse,* 482 F.Supp. 929 (S.D.Ohio 1979) (upholding Ohio law); *Brascan, Ltd. v. Lassiter,* Fed.Sec.L.Rep. ¶ 98,247 (E.D.La.1979) (striking down Louisiana law); *Dart Industries, Inc. v. Conrad,* 462 F.Supp. 1 (S.D.Ind.1978) (striking down Delaware law).

Two circuit court decisions were handed down recently. In *National City Lines, Inc. v. LLC Corp.,* No. 81–2044, 687 F.2d 1122 (8th Cir. August 17, 1982), the Eighth Circuit held that the Missouri Takeover Bid Disclosure Act contravened both the Commerce and Supremacy Clauses. In so doing, the court rejected defendants' abstention argument. The Missouri Act, like the Maryland Law, contains a 20 day advance notification requirement as well as hearing provisions.

In *Agency Rent-A-Car, Inc. v. Connolly,* No. 82–1337, 686 F.2d 1029 (1st Cir. August 16, 1982), the First Circuit reversed a district court's decision that a particular provision (not contained in the Maryland Law or addressed by the Supreme Court in *Edgar*) of the Massachusetts Takeover Law conflicted with the Williams Act. Indeed, the court distinguished *Edgar* by saying that "the provisions of the Illinois act that Justice White focused on all presented far more egregious conflicts with the Williams Act than is apparent here." At 1036. The court remanded the case to the district court to determine the validity of the Massachusetts law under the Commerce Clause in light of *Edgar.*

In *Kennecott Corp. v. Smith,* 637 F.2d 181 (3rd Cir. 1980), the Third Circuit held that the New Jersey Corporation Takeover Bid Disclosure Act conflicted with the Williams Act. The court did not address the Act's validity under the Commerce Clause and rejected an argument that it should abstain under the *Pullman* doctrine. The New Jersey Act, like the Maryland Law, contains a 20 day advance notification requirement as well as hearing provisions.

In *Great Western United Corp. v. Kidwell,* 577 F.2d 1256 (5th Cir. 1978), *rev'd on venue grounds sub nom., Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), the Fifth Circuit struck down the Idaho Takeover Act on both Commerce Clause and Supremacy Clause grounds. Like the Maryland Law, the Idaho Act contained an advance notification requirement and a provision excluding tender offers approved by the board of directors of the target company from the Act.

The only full-fledged Fourth Circuit opinion on the constitutionality of a state takeover law is *Telvest, Inc. v. Bradshaw,* 618 F.2d 1029 (4th Cir. 1980). In that case the Fourth Circuit, without addressing the merits of the constitutionality issues, reversed a trial court decision enjoining the Virginia Take-Over-Bid Disclosure Act because the district court misapplied the preliminary injunction test. The Fourth Circuit did say, however, that:

> While it is not stressed by the parties, nor addressed by the district court, we can imagine, for example, that a potential conflict between State and federal law may exist in the opportunity given under Virginia law, § 13.1–531, for a hearing upon notice of a take-over bid, which opportunity is not given by the Williams Act. At this stage of this proceeding, however, we are unable to say that any such conflict does exist, for, as we have before noted, the States have not been precluded from legislating in the securities field, state blue sky laws being a perfect example.

618 F.2d at 1035. In this vein, it should be recalled that the Supreme Court in *Edgar* distinguished the blue sky laws from state takeover laws. The *Telvest* court also stated that "we do not intimate that there may be an impermissible burden on interstate commerce, as we do not intimate that there is." 618 F.2d at 1036.

In *Hi-Shear Industries, Inc. v. Campbell,* Fed.Sec.L.Rep. ¶ 97,804 (D.S.C.1980), *stay pending app. denied,* No. 80–1825 (4th Cir. December 8, 1980), the Fourth Circuit, in denying a motion to stay a district court's decision enjoining the enforcement of the South Carolina Tender Offer Disclosure Act on Commerce Clause and Supremacy Clause grounds, stated that "it appearing to the court for reasons adequately stated by the district court . . . that the Williams Act and the South Carolina Securities Act contain conflicting provisions . . . the application for a stay pending appeal is denied." The South Carolina Act, like the Maryland Law, contained hearing provisions.

*Abstention is Inappropriate in this Case.*

As noted earlier, the defendants state that since the Commissioner is given sweeping powers to modify the Maryland Law, the contours of the Law are unsettled and therefore this Court should abstain from deciding the constitutionality of the Maryland Law. A similar argument was made and accepted in *Hi-Shear Industries, Inc. v. Neiditz,* Fed.Sec.L.Rep. ¶ 97,805 (D.Conn. 1980). Significantly, in the *Neiditz* case,

after the state court "settled" the unsettled issues of state law, the federal court held that the state court's construction of the Act was unconstitutional on both Commerce Clause and Supremacy Clause grounds. *See* State's brief at pp. 9–10.

In the *Neiditz* decision abstaining from deciding the constitutionality of the Connecticut Act, the court stated:

> Because the Commissioner has such broad discretion and because he has never been called upon to interpret or apply the State Act to a tender offer covered by the new SEC rules, it would be inappropriate for this Court to hold now, that he could not or would not exercise his discretion in such a way that conflict between the State Act and the federal law is avoided. If the Court were to decide that conflict between the State Act and federal law is likely to result from the Commissioner's application of the Act to the tender offer at issue here, the Court would be creating that "unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication," *Harmon v. Forssenius,* 380 U.S. 528, 534 [85 S.Ct. 1177, 1181–1182, 14 L.Ed.2d 50] (1965), which the practice of abstention is supposed to avoid. *See Railroad Commission v. Pullman Co.,* 312 U.S. 496 [61 S.Ct. 643, 85 L.Ed. 971] (1941); *England v. Medical Examiners,* 375 U.S. 411 [84 S.Ct. 461, 11 L.Ed.2d 440] (1964); *Lake Carriers' Association v. MacMullan,* 406 U.S. 498 [92 S.Ct. 1749, 32 L.Ed.2d 257] (1972); and *Bellotti v. Baird,* 428 U.S. 132 [96 S.Ct. 2857, 49 L.Ed.2d 844] (1976).

Fed.Sec.L.Rep. ¶ 97,805 at 90,037.

In a footnote the court also stated:

> For reasons similar to those that counsel abstention on the preemption issue, abstention is also appropriate on the Commerce Clause question. The resolution of Commerce Clause question requires a careful balancing of the burden imposed on interstate commerce by the state regulation against the local benefits

that flow from the regulation. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 [90 S.Ct. 844, 847, 25 L.Ed.2d 174] (1970). It may be that the Commissioner will interpret and apply the State Act in such a way that interstate commerce is unduly burdened. But it is equally possible that he will use the broad discretionary power vested in him by the State Act to minimize the burden on interstate commerce attendant upon the Act. Consequently, the proper course for the Court to take on this issue is to abstain pending action by the Commissioner.

*Id.,* n.3.

■ This Court believes that *Neiditz* was wrongly decided and should not be followed. Abstention is inappropriate in this case because there is no unsettled issue of Maryland Law. Rather, the only unsettled issue is whether the Commissioner chooses to apply the Law to Bendix and other offerors. In light of this Court's view that the Maryland Law is unconstitutional which is discussed *infra,* to abstain on the grounds that the Commissioner has authority to modify the Law is like abstaining from deciding the constitutionality of a law permitting unreasonable searches and seizures just because the law says that policemen have discretion in picking which houses to unreasonably search. Significantly, the defendants have not presented this Court with any possible way that the Commissioner could utilize his powers of modification that would render the Maryland Law constitutional. The only way for the Maryland Law to be rendered constitutional is for the Commissioner to apply it only to tender offers which have no, or very little, affect on interstate commerce. The Bendix-Martin Marietta tender offer cannot be so characterized.

Courts have frequently stated that abstention is not appropriate where it is clear that the state statute is unconstitutional no matter how it may be construed by the state courts. *Nebraskans for Independent Banking v. Omaha National Bank,* 423 F.Supp. 519, 522 (D.Neb.1976). *See also Zbaraz v. Quern,* 572 F.2d 582 (7th Cir.

1978); *United States v. Virginia,* 500 F.Supp. 729 (D.Va.1980); *Yuclan Enterprises, Inc. v. Arre,* 488 F.Supp. 820 (D.Haw.). In the case at bar, it would be unfair to Bendix to require them to wait to find out whether the Commissioner intends to apply the Maryland Law to its tender offer in light of the Law's unconstitutionality. Indeed, the whole purpose of a declaratory judgment action, such as the one Bendix has brought, is to "afford relief from [the] uncertainty" and insecurity of not knowing whether or not suit will be brought against it. *Ungar v. Dunkin' Donuts of America, Inc.,* 68 F.R.D. 65, 145 (E.D.Pa.1975), *rev'd on other grounds,* 531 F.2d 1211 (3rd Cir. 1976), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1977). *See also Freeman v. Marine-Midland Bank,* 419 F.Supp. 440 (S.D.N.Y.1976).

*The Maryland Law Imposes Burdens on Interstate Commerce that are Excessive in Relation to the Putative Local Benefits and is therefore Violative of the Commerce Clause.*

■ The Supreme Court's holding in *Edgar* that the Illinois Takeover Act is an impermissible indirect restraint on interstate commerce compels this Court to hold that the Maryland Law, which imposes similar burdens on interstate commerce as the Illinois Act, is unconstitutional under the *Pike v. Bruce* test. To paraphrase the Supreme Court, the Maryland Law imposes considerable burdens on interstate commerce because it gives Maryland the power to determine whether a tender offer may proceed anywhere. As the Supreme Court noted, the "effects of allowing" one state "to block a nationwide tender offer are substantial". These effects dwarf Maryland's legitimate interest in protecting Maryland stockholders.

*The Maryland Law is a Direct Restraint on Interstate Commerce and is therefore Violative of the Commerce Clause.*

■ While it is true that only four members of the Supreme Court stated that the Illinois Act was a direct restrain on interstate commerce, it is important to note that no Justices dissented from this view. This Court finds that the reasoning of those four Justices is persuasive and is equally applicable to the Maryland Law. The Maryland Law "directly regulates transactions which take place across state lines." Indeed, it is difficult to characterize the Maryland Law's "sweeping extraterritorial effect" as anything but a naked and direct restraint on interstate commerce.

*The Maryland Law Conflicts with the Goals and Purposes of the Williams Act and is therefore Violative of the Supremacy Clause.*

■ As Justice White pointed out, Congress, in enacting the Williams Act, took "extreme care to avoid tipping the scales either in favor of" a target company or an offeror. The Maryland Law, with its 20 day advance notification requirement, possibility of indefinite delay while a hearing or an investigation is pending and the exemption given to tender offers approved by the management of a target company, clearly tips the scales toward the target company. Accordingly, the Maryland Law serves to frustrate the full accomplishment and execution of the goals of the Williams Act and must be adjudged violative of the Supremacy Clause. The Courts of Appeals of the Third, Fifth and Eighth Circuits have reached the same conclusion with respect to identical provisions in other state takeover laws. *Kennecott, supra; Great Western, supra; National City Lines, supra.*

■ In conclusion, this Court finds itself with the unpleasant task of preliminarily enjoining enforcement of the Maryland Law against Bendix. No other conclusion can be reached given the high probability that the Maryland Law will be held unconstitutional and the irreparable harm that Bendix would be subjected to if the Maryland Law was not preliminarily enjoined.

A separate Order will be issued enjoining the enforcement of the Maryland Law.

SO ORDERED.